## No. 22-9001

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

## ROBERT WHARTON

### v.

## SUPERINTENDENT SCI GRATERFORD, *et al.*

---

Defendant's Appeal from the May 11, 2022 Judgment of the United States District Court for the Eastern District of Pennsylvania (Goldberg, J.) denying defendant's Petition for a Writ of Habeas Corpus at 2-01-cv-06049.

---

## BRIEF FOR APPELLEE

---

PAUL M. GEORGE
*Asst. Supervisor, Law Division*
NANCY WINKELMAN
*Supervisor, Law Division*
CAROLYN ENGEL TEMIN
*First Assistant District Attorney*
LAWRENCE S. KRASNER
*District Attorney of Philadelphia*

Office of the District Attorney
Three South Penn Square
Philadelphia, Pennsylvania 19107
(215) 686–8000

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................ii

**QUESTION PRESENTED** ......................................................... 1

**INTRODUCTION** ..................................................................... 2

**PROCEDURAL AND FACTUAL HISTORY** ......................................... 5

   A.  Prior State and Federal Court Proceedings........................................... 5

   B.  The Contents of Defendant's Prison Records ................................... 16

**SUMMARY OF ARGUMENT** .................................................................20

**ARGUMENT** ..................................................................... 22

Defense counsel's failure to investigate and present evidence of defendant's positive adjustment in state prison constituted ineffective assistance of counsel.................................................................... 22

   A.  Counsel acted unreasonably by failing to investigate and present defendant's prison-adjustment evidence. ............................................. 22

   B.  Defendant was prejudiced by counsel's failure to review and present mitigation evidence based on the prison records. ................................. 24

   C.  Defendant's 1992 hearing occurred during a period of institutionalized ineffective assistance of court-appointed counsel in Philadelphia capital cases.................................................................... 32

**CONCLUSION** ......................................................... 37

**COMBINED CERTIFICATIONS** ......................................................38

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

Blystone v. Horn,
  664 F.3d 397 (3d Cir. 2011) ..........................................................16, 26, 27
Fry v. Pliler,
  551 U.S. 112 (2007) ................................................................................ 31
Jurek v. Texas,
  428 U.S. 262 (1976) ................................................................................29
Kennedy v. Lockyer,
  379 F.3d 1041 (9th Cir. 2004)................................................................. 31
Medina v. Barnes,
  71 F.3d 363 (10th Cir. 1995)...................................................................32
Powell v. Collins,
  332 F.3d 376 (6th Cir. 2003)................................................................... 31
Skipper v. South Carolina,
  476 U.S. 1 (1986)............................................................................. 13, 29
United States v. Moussaoui,
  382 F.3d 453 (4th Cir. 2004)..................................................................... 6
United States v. Ottersburg,
  76 F.3d 137 (7th Cir. 1996).....................................................................32
United States v. Varoudakis,
  233 F.3d 113 (1st Cir. 2000)....................................................................32
Wharton v. Vaughn,
  722 F. App'x 268 (3d Cir. 2018)...................................................... Passim
Wiggins v. Smith,
  539 U.S. 510 (2003).................................................................................26

**State Cases**

Commonwealth v. Antoine Ligons,
  971 A.2d 1125 (Pa. 2009) ..........................................................................6
Commonwealth v. Green,
  581 A.2d 544 (Pa. 1990)...........................................................................29
Commonwealth v. McGarrell,
  77 E.M. 2011, 2012 Pa. LEXIS 2854 (2/21/12) .......................................38
Commonwealth v. Rainey,
  928 A.2d 215 (Pa. 2007) ............................................................................6

Commonwealth v. Sattazahn,
  763 A.2d 359 (Pa. 2000)...........................................................................33
Commonwealth v. Wharton,
  607 A.2d 710 (Pa. 1992).....................................................................10, 11
Commonwealth v. Wharton,
  665 A.2d 458 (Pa. 1995) ....................................................................11, 13
Commonwealth v. Wharton,
  811 A.2d 978 (Pa. 2002) ....................................................................13, 14
Commonwealth v. Williams,
  660 A.2d 1316 (Pa. 1995) .......................................................................33
Cox v. Commonwealth,
  218 A.3d 384 (Pa. 2019) .........................................................................37

## Rules

Fed. R. App. P. 32...........................................................................................42

## Other Authorities

Commonwealth Brief for Appellee,
  2002 WL 32181316 (Pa.) .........................................................................14
Commonwealth Brief for Appellee,
  2002 WL 32191636 (Pa.) .........................................................................14
Lerner Report,
  2012 Pa. LEXIS 2854, at *2-*3, *17 .......................................................38

## QUESTION PRESENTED

Was defendant prejudiced at his second death penalty hearing by defense counsel's failure to employ prison records from defendant's six years in state custody, to demonstrate his positive adjustment during that period and his probable good conduct in the future?

## INTRODUCTION

No one can reliably predict how each individual juror will respond, when asked to decide whether another person should live or die. Grave underlying offenses do not necessarily result in death sentences. *See* <u>United States v. Moussaoui</u>, 382 F.3d 453, 457 (4th Cir. 2004) (Jury returns life sentence where defendant's actions "result[ed] in the deaths of thousands of persons on September 11, 2001"); <u>State v. Nikolas Cruz,</u> (non-unanimous jury sentences shooter of seventeen Parkland high school students to life).[1] Conversely, a jury sometimes imposes death, despite significant mitigation. *See* <u>Commonwealth v. Rainey</u>, 928 A.2d 215, 221 (Pa. 2007) (death sentence imposed after jury finds three mitigators (age 18, absence of criminal history, catchall mitigator) and one aggravator (murder committed during the course of a felony)); <u>Commonwealth v. Antoine Ligons</u>, 971 A.2d 1125, 1134 (Pa. 2009) (jury finds no mitigating circumstances and imposes death, where Commonwealth asserted one aggravator (killing during perpetration of felony) and where defense asserted three mitigators (age 19, no significant criminal history, and catchall)). Where, short of clairvoyance, no individual

---

[1]      https://deathpenaltyinfo.org/news/non-unanimous-florida-jury-sentences-nikolas-cruz-to-life-without-parole-for-parkland-school-shootings

juror's response to a life and death decision can ever be known with certainty, three factors inform the Commonwealth's position here.

First, if there is any way to rationally predict how each of defendant's second penalty phase jurors would respond to the mixture of positive and negative information in his prison records, it is by assessing the degree of difficulty the jury already experienced in returning a death sentence, without that evidence. Here, despite a seventeen-day presentation where the Commonwealth introduced all of the uniquely horrible facts of defendant's crimes, the second penalty phase jury had great difficulty reaching a verdict. Notwithstanding these grim facts, there were one or more jurors who held out for life during three days, before finally sentencing defendant to death. As this Court has noted, at one point, the jurors announced that they were deadlocked. <u>Wharton v. Vaughn</u>, 722 F. App'x 268, 283 (3d Cir. 2018).

Second, it becomes even more difficult to predict the mindset of every individual juror, where bona fide experts on each side differed completely regarding the import of defendant's prison records. Who is to say whether one already reluctant juror might find the defense experts more persuasive? The difficulty is further enhanced here, where defendant's 1986 attempted escape from county custody—now emphasized so heavily by the amicus and the district court—never played any part at any prior level during the 30 years

of these proceedings, before the 2021 evidentiary hearing. Where the attempted escape played no role in any earlier proceedings, the existing record contains no clues as to how every juror would have weighed that fact against six years of largely positive prison adjustment.

Finally, one fact stands out with particular clarity. According to the amicus, if called to testify at the 1992 penalty hearing, reputable experts would have rebutted defendant's claim that he would be a well-adjusted, problem free inmate if sentenced to life without parole. According to those experts, because "past behavior is the best predictor of future behavior," defendant was likely to pose a significant future risk in the prison setting.

However, it is now undisputed that such predictions would have been inaccurate. As will be seen, defendant has been a problem free inmate for the ensuing 30 years. The Commonwealth cannot now argue that defendant's <u>Skipper</u> claim is meritless, simply because, in 1992, the introduction of defendant's prison records would have triggered the introduction of an expert's prediction of future dangerousness, which we all now know is incorrect. If defendant ever received a new penalty hearing, the jury would learn that his behavior has been unremarkable for nearly 30 years. Under these circumstances, there is a reasonable probability that 30

years of positive behavior would negate any evidence pertaining to defendant's 1989 infractions and his 1986 attempted escape.

## PROCEDURAL AND FACTUAL HISTORY

This section is divided into two subsections. Subsection A summarizes the state and federal proceedings leading up to this appeal. It does so with an emphasis on the facts underlying the issue presented here: whether defense counsel was ineffective for failing to introduce defendant's prison records to demonstrate his positive adjustment to incarceration, or whether the introduction of such evidence would have prompted such damaging rebuttal evidence, that every juror would have voted for the death penalty.

Subsection B focuses more narrowly on the contents of the prison records that defense counsel failed to secure and present.

## A.    Prior State and Federal Court Proceedings

Because of its importance to the question before this Court, the role played in this case by counsel's failure to secure defendant's prison records, as well as defendant's attempt to escape from Philadelphia's City Hall in 1986, must be set forth in some detail.

### Defendant's trial and the reversal of his initial death sentence

In 1985, after a trial conducted by the Honorable Francis A. Biunno, a jury convicted defendant Robert Wharton and codefendant Eric Mason of

two counts of first-degree murder and related offenses, in connection with the brutal 1984 murders of victims Bradley and Fern Hart and the abandonment of the victims' infant daughter, Lisa Hart, at the crime scene, after turning down the heat.  At the ensuing penalty phase hearing, the jury found three aggravating factors (killing in perpetration of a felony, grave risk of death to another person, and offense committed by means of torture) and three mitigating factors (no significant criminal history, the age of the defendant, and evidence of mitigation concerning defendant's character). The jury determined that the aggravators outweighed the mitigators and sentenced defendant to death.  Commonwealth v. Wharton, 607 A.2d 710, 713-715 (Pa. 1992).

On direct appeal, the Pennsylvania Supreme Court reversed defendant's death sentence due to a flawed jury instruction on the torture aggravator.  The Court then remanded the matter to the Court of Common Pleas for a second death penalty hearing.  Wharton, 607 A.2d at 723-24.

**Defendant's attempted escape from county custody**

In April 1986, after defendant's initial conviction and death sentence but *before* both his commitment to state prison and the ensuing remand order, defendant appeared in the Philadelphia Court of Common Pleas to plead guilty on another matter.  While still inside City Hall, he managed to

push a guard aside and run. He fled to a street outside City Hall, but was shot and apprehended before he could complete his escape. Defendant ultimately pleaded guilty to the charge of escape. Commonwealth v. Wharton, CP-51-CR-0819311-1986.

### Defendant's second penalty phase hearing

Six years later, in 1992, the trial court conducted a second penalty hearing. At this hearing, the Commonwealth proposed four aggravating factors: torture, grave risk to another, killing in perpetration of a felony, and prior conviction for a crime carrying a life sentence. A0290-A0295 (N.T. 12/21/92 at 111-116). Defendant submitted two mitigating factors: his age at the time of the crime and the "catchall" mitigator. A0265-A0275 (N.T. 12/21/92 at 86). The jury found two of the aggravating factors (killing in perpetration of a felony and prior conviction carrying a life sentence) and the catchall mitigator. A0342-A0344 (N.T. 12/23/92 at 5-7). It once again returned a verdict of death on both counts of murder. Commonwealth v. Wharton, 665 A.2d 458, 459 (Pa. 1995). Three aspects of this proceeding are significant for this appeal.

First, defense counsel did not secure defendant's prison records for the six years he spent in state custody between his two penalty hearings and did

not present any mitigation evidence regarding defendant's prison adjustment.

Second, during this lengthy proceeding, the Commonwealth spent seventeen days presenting all of the grim facts of defendant's underlying offenses to the new jury, after which defendant's family members offered brief mitigation evidence regarding his good character. A0697-A0694 (N.T. 3/8/21 at 70-73).[2]  However, although it would subsequently become a significant aspect of the 2021 federal proceedings, the Commonwealth did *not* present any evidence regarding defendant's 1986 escape attempt, to rebut defendant's character evidence.

Third, after the brief mitigation presentation from defendant's family members, the jurors deliberated for portions of three days. At one point, they reported that they were deadlocked. <u>Wharton</u>, 722 F. App'x at 279.[3]  At another point, the jurors expressed interest in the type of information that counsel failed to present—evidence regarding defendant's behavior *after* the

---

[2]    At the second hearing, defendant's family members testified that his "childhood was unremarkable, that he had good qualities, and that his family cared about him." <u>Wharton</u>, 722 F. App'x at 279. This presentation was comparatively brief. A0695 (N.T. 3/8/21 at 71).

[3]    As trial counsel explained, where a human life hung in the balance, many Philadelphia judges would have taken the case from a deadlocked jury. Here, however, the trial court sent the jury back for another day of deliberations. A0694-A0697 (N.T. 3/8/21 at 70-73).

crimes. In assessing the weight of defendant's character evidence, the jury specifically asked whether it could consider defendant's behavior after the crime, or simply his character as it existed at the time of the crime. A0330 (N.T. 12/22/92 at 10). The court told the jury it could consider defendant's character both before and after the crime. <u>Id</u>.

### State court proceedings after defendant's second hearing

On direct appeal, the Pennsylvania Supreme Court upheld defendant's death sentence. <u>Commonwealth v. Wharton</u>, 665 A.2d 458 (Pa. 1995). Defendant then filed a Petition for Post-Conviction Relief in the Philadelphia Court of Common Pleas. Importantly for this appeal, one of defendant's PCRA claims concerned penalty phase counsel's failure to obtain and introduce defendant's records for the six-year period that defendant spent in state prison between his two penalty hearings. According to defendant, these records showed that defendant made a positive adjustment to prison life and "was not a future danger should he be sentenced to life in prison." According to defendant, this information would have been admissible at defendant's second death penalty hearing under <u>Skipper v. South Carolina</u>, 476 U.S. 1 (1986). *See* <u>Commonwealth v. Wharton</u>, 811 A.2d 978, 988 (Pa. 2002). The PCRA court denied this claim without a hearing and the Pennsylvania Supreme Court affirmed. <u>Id</u>. at 982.

Significantly, at both the PCRA stage and in the state supreme court, the Commonwealth vigorously opposed any relief based on defendant's Skipper claim.  However, despite its opposition, the Commonwealth never argued that the introduction of defendant's prison records would have triggered the introduction of rebuttal evidence regarding defendant's 1986 attempt to escape from City Hall.  Nor did it ever argue that, if defendant presented evidence of positive prison adjustment, the Commonwealth would present psychology and penology experts to say that he posed a future threat in the prison setting.  *See e.g.* Commonwealth Brief for Appellee, 2002 WL 32181316 (Pa.), at *13-*17; Commonwealth Brief for Appellee, 2002 WL 32191636 (Pa.), at *13-*17.[4]

### Defendant's initial federal court proceedings

Defendant next filed a federal habeas corpus petition, once again raising defense counsel's failure to introduce state prison records regarding his adjustment during the period between his two hearings.  During these proceedings, the Commonwealth continued to argue that defense counsel was not ineffective for failing to do so.  However, as in the earlier the state court proceedings, the Commonwealth did not argue that the introduction of

---

[4]    For reasons unrelated to the issue presented here, each party filed two briefs in connection with defendant's appeal from the denial of his PCRA petition.  Wharton, *supra*, 811 A.2d at 982.

prison behavior evidence would result in rebuttal evidence regarding defendant's 1986 escape attempt—a topic that neither party addressed. Nor did it ever argue that the introduction of such evidence would justify the introduction of expert testimony to rebut defendant's claim that he posed no threat in the prison setting. A1523-A1530 (ECF No. 36, 9/8/04).

Although it took testimony regarding certain other ultimately unsuccessful claims, the district court denied defendant's <u>Skipper</u> claim without an evidentiary hearing. This Court then granted a Certificate of Appealability on that issue. In its appellate brief, the Commonwealth continued to argue that counsel was not ineffective for failing to secure and present defendant's prison records. But again, it never argued that the introduction of prison behavior evidence would trigger the introduction of damaging rebuttal evidence regarding defendant's 1986 escape attempt. A1531-A1533 (Document No. 003112295142, 15/13/16). In short, in none of the Commonwealth's numerous briefs seeking to contest defendant's <u>Skipper</u> claim, did it ever mention what the amicus and the district court now find decisive.

Evaluating this claim, this Court agreed that defendant made a *prima facie* showing that counsel's failure to investigate his prison records was unreasonable:

> [I]f counsel has failed to conduct a reasonable investigation to *prepare* for sentencing, then he cannot possibly be said to have made a reasonable decision as to what to *present* at sentencing.

Wharton, 722 F. App'x at 282 *quoting* Blystone v. Horn, 664 F.3d 397, 420 (3d Cir. 2011) (emphasis in original).  In addition, this Court determined that defendant made a *prima facie* showing regarding the Strickland prejudice prong:

> ... [Defendant] has made a *prima facie* showing that there is a reasonable probability that at least one juror would have changed his or her vote if presented with this evidence.

Id. at 283.  On this basis, after affirming the district court's denial of defendant's other claims, this Court vacated the district court's order denying habeas relief and remanded this matter for an evidentiary hearing regarding defense counsel's potential ineffectiveness for failing to present Skipper evidence.  Id. at 284.

### Proceedings on remand in the district court

After remand, the Commonwealth re-evaluated its position regarding defendant's ineffectiveness claim and notified the district court that it agreed that defendant was entitled to penalty phase relief.  The district court declined to accept the Commonwealth's concession and appointed the Pennsylvania Attorney General as an amicus.  The court also allowed the amicus to participate as a litigant against penalty phase relief at the ensuing

evidentiary hearing.  During this hearing, defendant and the amicus both presented expert and fact witnesses.

**The testimony of experts**

The defense and the amicus both presented testimony from experts in the fields of psychology and penal institutions, all of whom had the appropriate credentials and all of whom were accepted by the hearing court as experts in their areas.  Predictably, the experts differed on whether defendant's prison records reflected an overall positive or negative adjustment.  They also differed regarding the estimates they would have offered as to defendant's future behavior in the prison setting, if they had been called in 1992 to testify at his second penalty hearing.

Defense prison expert Maureen Baird testified that, on the whole, defendant adjusted positively during the six years between the hearings. A1384-A1385 (N.T. 8/5/21 at 38-39).  According to Ms. Baird, in the future, as defendant aged, he was likely to be an adjusted inmate.  A1417-A1419 (N.T. 8/5/21 at 71-73).  Defense psychiatrist Dr. Neil Blumberg reached a similar conclusion.  According to Dr. Blumberg, despite committing six disciplinary infractions during his years of incarceration between the hearings, defendant "made a positive adjustment to incarceration" and would continue to do so in the future.  A0425-A0426 (N.T. 2/25/21 at 20-21).

In response, the amicus presented the testimony of psychiatrist John O'Brien. Dr. O'Brien opined that "past behavior is the best predictor of future behavior." A0870 (N.T. 3/16/21 at 71). Based on defendant's 1986 escape attempt and his subsequent state prison infractions, O'Brien concluded that defendant's prison adjustment had been poor. A0808-A0809 (N.T. 3/16/21 at 9-10) (defendant's "behavioral transgression" in prison "was consistent with surreptitious future planning while portraying himself as polite, pleasant, and well-adjusted"). If called at defendant's death penalty hearing, O'Brien would have testified that defendant's prognosis for future adjustment was poor. A0752-A0753 (N.T. 3/8/21 at 41-42).

The amicus's prison expert, Dr. Jeffrey A. Beard, offered similar testimony. According to Dr. Beard, four of defendant's six prison infractions were non-violent and non-serious. A1102 (N.T. 5/11/21 at 19) ("four of them taken individually, seemed rather minor"). However, on two occasions within a five-day period in 1989, defendant possessed a homemade handcuff key. According to Dr. Beard, these two infractions indicated that defendant had not adjusted to prison and would not do so in the future. In addition, for Dr. Beard, defendant's overuse of the prison-instituted grievance procedure was further evidence of his poor adjustment. A1144, A1204 (N.T. 5/11/21 at 61, 121). If defendant had never possessed the handcuff key, Beard's

assessment of defendant's prison adjustment "would still be a negative". A1151-A1152 (N.T. 5/11/21 at 68-69).

Accordingly, if called in 1992, both amicus experts would have testified that defendant was unlikely to adjust positively to incarceration. Therefore, according to the amicus, defense counsel was not ineffective for failing to introduce defendant's records, because the introduction of these records would have prompted damaging expert testimony in rebuttal. However, as noted above, one fact stands out concerning the amicus experts' opinions: neither expert reviewed defendant's records for the period *after* the second penalty hearing, to learn what defendant's subsequent adjustment had actually been. A0863-A0867 (N.T. 3/16/21 at 64-68) (Dr. O'Brien); A1156 (N.T. 5/11/21 at 73) (Dr. Beard).[5] In fact, contrary to their predictions, defendant was a problem free inmate during the 30 years following the second penalty hearing. A0498-A0502 (N.T. 2/25/21 at 93-98); A0864 (N.T. 3/16/21 at 65); A1156 (N.T. 5/11/21 at 73); A1419 (N.T. 8/5/21 at 73).

---

[5] Although it asked its experts for an opinion regarding defendant's prognosis for future prison adjustment, the amicus did not provide its experts with prison records for any period after 1992. A0865-A0866 (N.T. 3/16/21 at 66-67) (Dr. O'Brien); A1156 (N.T. 5/11/21 at 1156) (Dr. Beard).

### The testimony of fact witnesses

Both defendant and the amicus also presented fact witnesses. The amicus presented testimony to confirm that, in 1986, defendant attempted to escape from City Hall while in county custody and that, during his six years in state prison, he committed six disciplinary infractions, two of which were serious. The Commonwealth did not contest the accuracy of any of this testimony.

Defendant introduced testimony from trial counsel—the only living professional who was present at the 1992 penalty hearing. Counsel testified that he believed the prison records were "extremely favorable". A0537 (N.T. 2/25/21 at 132). He was "so regretful" that he had not presented them. A0544, A0568 (N.T. 2/25/21 at 139, 163). He "unequivocally" believed that they would have made a difference. A0697 (N.T. 3/8/21 at 73). He acknowledged that his failure to order the records was not a strategic decision. A0536-A0537 (N.T. 2/15/21 at 131-132). As he explained, at the time of the 1992 hearing, he did not realize that the 1986 <u>Skipper</u> decision authorized a defendant facing the death penalty to introduce prison records to demonstrate positive adjustment. A0571 (N.T. 2/25/21 at 166).

### B.    The Contents of Defendant's Prison Records

Defendant's prison records between 1986 and 1992 contain both positive and negative reports regarding his conduct. As this Court has noted,

"Most of [defendant's prison] evaluations … were positive.  Although they were brief and did not provide much in the way of specifics, they indicated that Wharton was adjusting well to prison life and that his behavior was generally satisfactory."  <u>Wharton</u>, 722 F. App'x at 283.

Many of these reports reflect defendant's lack of misconducts and his participation in constructive activities, such as religious studies and job training.  A1549.  A series of Monthly Program Review Committee reports references his appropriate behavior toward correctional officers and other DOC employees, including his counselor.  72 such monthly reports appear in defendant's prison records for 11/5/86 through 10/27/92. A1581-A1652.  In addition, the institution's yearly planning reports do not describe him as a problem inmate.  A1573-A1577.  He consistently used the prison grievance procedure to complain about things he believed to be unfair, and also to seek access to GED courses.  A1578, A1580.  During his time on death row at SCI Huntingdon, there were no reports of assaultive conduct, mental health breakdowns, or attempts to harm himself.  A1581-A1653.

On the other hand, during those years, defendant committed six disciplinary infractions.  Four of them were regarded as "rather minor" by amicus expert Dr. Beard, the former Secretary of the Pennsylvania Department of Corrections. A1102 (N.T. 5/11/21 at 19).  The other two

infractions were unquestionably more serious. They both occurred within a one-week interval during May 1989—approximately three years into the six-year period between his two penalty hearings. A1555-A1572. Defendant incurred these infractions when officials searched his cell on two occasions. On the first occasion, they discovered a homemade handcuff key. A1556. During the second search, they recovered a four-inch piece of radio antenna, from which such a key can be fashioned. A1564. As a result of these offenses, defendant was sentenced to a period of more restrictive confinement, without privileges, for two periods of 90 days. A1560, A1567. He was released early from this more restrictive confinement, for good behavior. A1616.

No evidence indicated that defendant took steps to use the key to open a set of handcuffs or to take some other impermissible action. Significantly, the Monthly Program Review reports for this period continue to contain positive comments about his adjustment. A1611 (5/3/89 - "No major concerns or complaints are noted."); A1612 (6/7/89 - "Mr. Wharton has been assigned to the Education Department's Call Study Program."); A1613 ("Mr. Wharton had a problem free period of adjustment.") After his release from

restricted confinement for this offense, his records for the next three years do not reflect serious problems.[6]

At the conclusion of the evidentiary hearing and after consideration of the parties' post-hearing briefs, the district court determined that counsel was not ineffective, because every juror would still have voted for death if counsel had introduced the evidence of positive prison adjustment contained in defendant's prison records. The district court granted a COA on this issue.

---

[6]    Defendant was cited once for practicing impermissible martial art moves while exercising alone in a caged area reserved for capitally sentenced prisoners. His sanctions were limited to a reprimand and a warning. A1655.

## SUMMARY OF ARGUMENT

Defendant has shown that penalty phase counsel acted unreasonably by failing to investigate and introduce defendant's prison-adjustment evidence. Counsel did not secure or review these records prior to the hearing and his failure to do so was not a strategic decision. A0536-A0537 (N.T. 2/15/21 at 131-132). At the time of the 1992 hearing, he did not realize that Skipper v. South Carolina authorized the presentation of such evidence. A0571 (N.T. 2/25/21 at 166).

Defendant has also demonstrated a reasonable probability that at least one juror would have voted against imposing the death penalty. Despite his two serious disciplinary infractions while in state prison, defendant's records contained substantial evidence of positive adjustment. Reputable defense experts testified that his records reflected a positive adjustment and the likelihood of future good behavior. Where the jurors labored for parts of three days to reach a unanimous verdict, and where they at one point announced that they were deadlocked, there is a reasonable probability that one juror would have credited this testimony and relied upon it to continue to vote for life.

The amicus now argues that counsel was not ineffective, because if he had introduced defendant's prison records, the prosecution would have

presented rebuttal experts to opine that defendant was and would remain a dangerous inmate. Although these experts would have testified in good faith that defendant's prognosis for future adjustment was poor, we now know that defendant has been a problem free inmate for the ensuing 30 years. A0498-A0502 (N.T. 2/25/21 at 93-98); A0864 (N.T. 3/16/21 at 65); A1156 (N.T. 5/11/21 at 73); A1419 (N.T. 8/5/21 at 73). Where their predictions have proven to be incorrect, the Commonwealth cannot in good faith agree that these inaccurate predictions would have swayed every juror to vote for death.

# ARGUMENT

**Defense counsel's failure to investigate and present evidence of defendant's positive adjustment in state prison constituted ineffective assistance of counsel.**

As this Court has explained, "To prevail on this claim, Wharton must show that (1) [trial counsel] acted unreasonably by failing to investigate and/or present Wharton's prison-adjustment evidence, and (2) had [counsel] presented that evidence at the second penalty hearing, there is a reasonable probability that at least one juror would have voted against imposing the death penalty." <u>Wharton</u>, 722 F. App'x at 281.   For the following reasons, the Commonwealth believes that defendant has made that showing.

## A.    Counsel acted unreasonably by failing to investigate and present defendant's prison-adjustment evidence.

Death penalty counsel must make "efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." <u>Wiggins v. Smith</u>, 539 U.S. 510, 524 (2003); <u>Blystone v. Horn</u>, 664 F.3d 397, 420 (3d Cir. 2011). Prior to the evidentiary hearing, defendant made a *prima facie* showing that counsel's failure to investigate his prison records was unreasonable. <u>Wharton</u>, 722 F. App'x at 282. As this Court observed, "[I]f counsel has failed to conduct a reasonable investigation to *prepare* for sentencing, then he

cannot possibly be said to have made a reasonable decision as to what to *present* at sentencing." <u>Wharton</u>, 722 F.App'x at 282 *quoting* <u>Blystone</u>, 664 F.3d at 420 (emphasis in original).

Based on his testimony, there can be little question that counsel's failure to investigate defendant's prison records was unreasonable. Counsel was court-appointed. A0510 (N.T. 2/25/21 at 105). This was his first case representing a defendant at a death penalty hearing. A0511 (N.T. 2/25/21 at 106). He lacked the resources that would be standard in any capital proceedings today. Typically for that era, the court did not provide funding for co-counsel, a mitigation specialist, a social worker, or an investigator. A0520 (N.T. 2/25/21 at 115) ("I would not know at that time what a mitigation expert was."). He did not consult any experts. <u>Id</u>.

Most importantly, his failure to order the prison records was not a strategic decision. A0536-A0537 (N.T. 2/15/21 at 131-132). In fact, he did not realize that <u>Skipper</u> permitted a defendant to introduce prison records to demonstrate positive adjustment. A0571 (N.T. 2/25/21 at 166).

Under these circumstances, there can be little question that counsel had no reasonable basis for failing to secure and present mitigation evidence from defendant's prison records.

**B.    Defendant was prejudiced by counsel's failure to review and present mitigation evidence based on the prison records.**

Although this case poses a life and death question, there is no mathematically correct answer and no answer that is compelled by precedent.  Would evidence regarding defendant's earlier escape have so enhanced the significance of defendant's subsequent handcuff key infractions (which occurred within a five-day period in 1989) to the point that every juror would have (a) disregarded the remaining six years of defendant's overall positive adjustment, and (b) concluded that defendant posed a long-term threat of future dangerousness?  To some observers, it might make "common sense" that most death qualified jurors would give greater weight to defendant's escape attempt than they would to testimony from defense experts who predicted his future good behavior.  But there is no basis to conclude, with assurance, that every juror would so respond or that no juror would find the defense experts persuasive.  As this Court has observed:

> [A] jury need not give the same amount of weight to each factor that it finds, and it is certainly possible that a jury's receipt of additional evidence regarding a particular factor would cause one or more jurors to assign more weight to that factor.

<u>Wharton</u>, 722 F. App'x at 281.

The Supreme Court has explained the twofold significance of positive prison adjustment. First, in and of itself, evidence that a prisoner has adjusted positively during the time already served is potentially mitigating. Skipper, 476 U.S. at 5. Thus, as the Skipper court determined, it was error for the trial court to preclude evidence that appellant conducted himself well in prison, even though he had only been in jail for the 7½ months between his arrest and trial. Skipper, 476 U.S. at 3.

Second, and even more importantly, evidence regarding prison adjustment enables the jury to estimate what the defendant's *future* behavior will be. As the Supreme Court emphasized:

> Consideration of a defendant's past conduct as indicative of his probable *future behavior* is an inevitable and not undesirable element of criminal sentencing: "any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose."

Skipper, at 5 *quoting* Jurek v. Texas, 428 U.S. 262, 275 (1976) (Opinion of Stewart, Powell, and Stevens, JJ.) (emphasis added); *see also* Commonwealth v. Green, 581 A.2d 544, 562–563 (Pa. 1990) ("[E]vidence bearing on a defendant's behavior in jail, and hence, upon his likely future behavior in prison, might affect a jury's decision to impose a death sentence.").

Hence, the question here is not simply whether defendant adjusted positively between his two penalty hearings. The question is also how the jury—had it been informed of defendant's adjustment—would have assessed defendant's "likely future behavior". Here, we now know that any 1992 prediction that defendant would be a future danger in the prison setting would have been inaccurate. In the intervening three decades, he has been a problem free inmate. A0498-A0503 (N.T. 2/25/21 at 93-98); A1419 (N.T. 8/5/21 at 73). Despite this knowledge, the amicus argues that, in 1992, the Commonwealth's experts could have persuaded every juror to vote for death on the basis of a subsequently proven-wrong prediction that he would be a future problem.

For the following reasons, the Commonwealth does not share that position. On the basis of the evidence adduced at the evidentiary hearing, there is a reasonable probability that at least one juror would have voted for life. Four arguments support this conclusion.

### 1. *The jury deliberated for three days despite the grim facts of this case.*

For seventeen days, defendant's jury listened to the facts of these murders. A0523-A0524 (N.T. 2/25/21 at 118-119). Such proceedings pose unique problems for the defense. Guilt is no longer in issue and there is no role for residual doubt. Moreover, unlike a combined guilt and penalty phase

trial, the jury cannot register its indignation by finding a defendant guilty, yet still exercise mercy at the penalty phase.  In contrast, in the type of stand-alone penalty trial that occurred here, there is a genuine concern that, to the jury, a life sentence will viscerally seem like an acquittal.

Despite these factors, defendant's jury was out for parts of three days. Critically, at one point it reported that it was deadlocked.  Where, despite the emotional impact of these murders, a death qualified jury struggled to reach a verdict, it cannot be concluded that the additional negative facts would necessarily override the impact of six years of largely positive prison adjustment, in the mind of every juror.  As Justice Stevens' concurrence in Fry v. Pliler, 551 U.S. 112, 125 (2007) notes, a jury's uncertainty in reaching a verdict should be a significant factor in determining whether an error affected the outcome of a trial.  Id. at 125 (jury's "evident uncertainty in reaching a verdict" creates a "near-conclusive presumption" that error was not harmless) *citing* Kennedy v. Lockyer, 379 F.3d 1041, 1056, n.18 (9th Cir. 2004) ("From the fact that the first trial ended in a mistrial, as well as the fact that the jury deliberated for a considerable amount of time in the second trial, we infer that the question as to [the defendant's] guilt or innocence was a close one in both trials."); Powell v. Collins, 332 F.3d 376, 401 (6th Cir. 2003) (finding prejudicial error in a habeas case in part because the jury at

one point told the court that it was "at a stalemate"); <u>United States v. Varoudakis</u>, 233 F.3d 113, 127 (1st Cir. 2000) (noting, in weighing harmlessness, that "the jury's 'impasse' note reveals uncertainty about [the defendant's] guilt"); <u>United States v. Ottersburg</u>, 76 F.3d 137, 140 (7th Cir. 1996) ("The length of the jury's deliberations makes clear that this case was not an easy one."); <u>Medina v. Barnes</u>, 71 F.3d 363, 369 (10th Cir. 1995) (finding prejudice in a habeas case where "at one point during their deliberations, the jurors indicated that they might be unable to reach a unanimous verdict"). Where, as here, the question is one of life or death rather than simply a defendant's guilt, the jury's struggle to reach a decision is entitled to even greater weight.

### 2. *The jury asked for the type of information that counsel failed to present.*

Another aspect of the original jury's deliberations is worthy of note. At least some members of defendant's jury wanted to know exactly the information that counsel failed to present—defendant's behavior *after* the crimes. In assessing the weight of defendant's character evidence, the jury specifically asked whether it could consider defendant's behavior after the crime, or simply his character as it existed at the time of the crime. A0330 (N.T. 12/22/92 at 10).

As noted, although defendant's 1986 escape attempt has moved to center stage in 2021, the prosecution made no attempt to use that fact at the 1992 penalty hearing, either to establish the aggravators or to rebut defendant's good character evidence. *See e.g*. Commonwealth v. Sattazahn, 763 A.2d 359, 369 (Pa. 2000); Commonwealth v. Williams, 660 A.2d 1316, 1323 (Pa. 1995) (jury may consider all of defendant's existing convictions, including crimes committed after the crime at issue). Nor did the Commonwealth rely on the escape attempt in any of its pre-2021 responses to defendant's Skipper claim.

Where the prosecution never told the jury about the escape attempt and where some jurors specifically wanted to know whether they could consider evidence regarding defendant's character after the murders, the Commonwealth believes that at least one juror would have viewed defendant's six years in custody in a positive light and voted for life.

### 3.  *Reputable experts disagreed on whether defendant adjusted positively to state prison.*

Here, both sides presented the opinion testimony of experts, each of whom was qualified in their respective field. Each expert adhered to their opinion despite cross-examination. Although they did not agree, each expert supported their opinion with evidence from defendant's prison records.

Significantly, the amicus's prison expert agreed with the defense that four of defendant's six prison infractions were non-violent and non-serious. A1102 (N.T. 5/11/21 at 19) ("four of them taken individually, seemed rather minor"). However, both amicus experts testified that his two handcuff key infractions, occurring during a five-day period in 1989, invalidated the remaining six years of defendant's incarceration and showed that he did not and would not adjust positively to prison. Two equally qualified defense experts reached the opposite conclusion. To them, these non-violent infractions did not negate his six years of otherwise acceptable conduct.

The question then becomes: where equally qualified experts differ, would each and every juror, in a group that deliberated over the course of three days and was at one point deadlocked, agree with the amicus experts and reject the opinion of the defense experts? Or would one juror, who had at one point voted for life, adhere to that position on the basis of the defense experts' testimony regarding defendant's remaining six years of acceptable prison behavior? Although there can be no certain answer to this question, there is a reasonable probability that one juror—who already held out for life for three days in the face of the Commonwealth's seventeen-day presentation regarding the brutal facts of these murders—would have credited the defense

experts and relied on their opinion to vote for life.  As trial counsel observed, the experts "would have been an even match".  A0570 (N.T. 2/25/21 at 165).

### 4.  *Specific reasons why at least one juror might have credited the defense experts.*

There are substantial reasons why one juror could have credited the defense experts, rather than those presented by the amicus.  During amicus expert Beard's testimony, it became clear that, for him, the discovery of the homemade handcuff key negated any other evidence of positive adjustment.  From then on, despite any prior or future evidence of positive behavior, defendant would remain "poorly adjusted".  For Beard, even defendant's use of the prison-instituted grievance procedure became evidence of poor adjustment.  A1144, A1204 (N.T. 5/11/21 at 61, 121).  Even if defendant never possessed the handcuff key, Beard's assessment of defendant's prison adjustment "would still be a negative".  A1152 (N.T. 5/11/21 at 69).[7]

In view of expert Beard's unwillingness to concede the positive aspects of defendant's prison record, there is a reasonable probability that at least one juror would have doubted his objectivity and rejected his conclusion that

---

[7]    Even expert Beard seemed to tentatively modify his assessment when he learned, apparently for the first time, that defendant had no misconducts for the past three decades.  A1165-A1157 (N.T. 5/11/21 at 73-74) ("I think if he hasn't had any misconducts, I think that's very commendable.  I think that's a good thing, but that's not what I looked at.  And I have no knowledge of what he's done or hasn't done since then.").

two infractions over a five-day period permanently categorized defendant as a poorly adjusted inmate.

For similar reasons, at least one juror might have questioned amicus expert O'Brien's objectivity. Dr. O'Brien opined that the prognosis for defendant's future adjustment was poor. He would have offered that opinion if called as a witness in 1992. A0752-A0753 (N.T. 3/8/21 at 41-42); AA0808-A0809 (N.T. 3/16/21 at 9-10). Yet, when asked if he had reviewed records of defendant's adjustment between 1992 and 2021, he acknowledged that he had not. A0863-A0864 (N.T. 3/16/21 at 64). Thus, although he would have told the 1992 jury that defendant's prognosis was poor, he never checked to determine the accuracy of his prediction. Under these circumstances, like Dr. Baird, at least one juror might have concluded that expert O'Brien's opinion was one-sided and unpersuasive.

### C. Defendant's 1992 hearing occurred during a period of institutionalized ineffective assistance of court-appointed counsel in Philadelphia capital cases.

The following factors also inform the Commonwealth's position here. As then Pennsylvania Attorney General Josh Shapiro observed:

> As AG, I have seen firsthand how systemic inequities impact every level of our society, from the workforce to the criminal justice system—and I believe the death penalty is built on that unfair system, and should not exist in our Commonwealth. It is not shown to be an effective deterrent, it costs taxpayers an

estimated $272 million per execution, and the time has come to end it in Pennsylvania.[8]

      *    *    *    *    *    *    *    *    *

I believe that the [capital punishment] system is broken and in need of real repair and reform. For too long, it has targeted communities of color in an unfair way.[9]

The former Attorney General's conclusions are verified by the Philadelphia District Attorney Office's own study of 155 death sentences imposed in Philadelphia County, 152 of which were imposed between 1980 and 2012.[10] Due to the systemic lack of meaningful compensation, training, or support for court-appointed counsel, this was a period of institutionalized ineffective assistance of counsel in Philadelphia. During this time, compensation for court-appointed counsel was "woefully inadequate"

---

[8]    https://joshshapiro.org/news/criminal-justice-reform-in-pennsylvania/

[9]    https://www.penncapital-star.com/campaigns-elections/capital-star-qa-josh-shapiro-on-the-death-penalty-climate-and-harrisburg/

[10]    The Commonwealth prepared this Study as an exhibit, in response a King's Bench Petition filed by death-sentenced Pennsylvania prisoners, challenging the constitutionality of the state's death penalty, as applied. *See* Cox v. Commonwealth, 218 A.3d 384 (Pa. 2019). This Study excluded a limited group of Philadelphia capital cases: (1) death penalties that were overturned *after* Lawrence S. Krasner became District Attorney, (2) cases where the defendant died in custody before the resolution of his post-conviction claims, and (3) the case of Gary Heidnik, the only Philadelphia defendant who filed no post-conviction appeals. The Commonwealth submitted this Study as an Exhibit with its post-hearing brief here. It is attached here as the Commonwealth's Supplemental Appendix.

($1800 to prepare a capital case and $400 for each day of trial).  *See* Lerner Report, 2012 Pa. LEXIS 2854, at *2-*3, *17.[11]  According to the Lerner Report, the compensation system "punishe[d]" counsel for properly handling death penalty cases.  Id. at *27.  This is because the system provided a financial incentive for an attorney to engage in minimal pretrial preparation and encouraged the attorney to take the case to trial, even though for most capitally charged defendants the best outcome is a non-trial resolution.  Id. at *17-*18, *27.

In addition, as trial counsel's testimony here makes clear, the system provided virtually no support in that era for court-appointed counsel.  No training existed, even for someone such as trial counsel here, who was handling his first penalty phase.  Nor was there funding for experts, investigators, mitigation specialists, or second chair counsel.  A0518-A0521 (N.T. 2/25/21 at 113-116).   As trial counsel poignantly testified, "I was there alone."  A0698 (N.T. 3/8/21 at 74).

Although these systemic deficiencies are shocking, the results are not.

---

[11]    In 2011, the Pennsylvania Supreme Court appointed Judge Benjamin Lerner to study the issue of compensation for court-appointed counsel in Philadelphia capital cases.  *See* Commonwealth v. McGarrell, 77 E.M. 2011, 2012 Pa. LEXIS 2854 (2/21/12).  We refer here to Judge Lerner's Report as "the Lerner Report".

As of January 1, 2018, 72% of the 155 Philadelphia death sentences (112 out of 155) had been overturned at some stage of post-conviction review. 66% of the 112 overturned death sentences (74 out of 112) were specifically overturned because of ineffective assistance of trial counsel. Predictably, in 78% (58 out of 74) of the Philadelphia cases overturned due to ineffective assistance of counsel, the defendant was represented by court-appointed counsel—i.e., an attorney selected by the court to represent an indigent defendant. In 51% (38 out of 74) of the Philadelphia cases overturned due to ineffective assistance of counsel, the reviewing court specifically based its determination on trial counsel's failure to prepare and present a constitutionally acceptable mitigation presentation.

Disturbingly, 91% (41 out of 45) of the Philadelphia defendants on death row in 2018 were, like defendant here, members of a racial minority group. 82% (37 out of 45) of these defendants were, like defendant, African American. In addition, 80% (36 out of 45) of the Philadelphia defendants on death row in 2018 were, like defendant, represented by court-appointed counsel.

Defendant Wharton's case exemplifies nearly all of the systemic problems described above. Like most Philadelphia defendants still on death row, defendant is an indigent person of color, who was represented at trial

by court-appointed counsel. His penalty hearing occurred in December, 1992, during the period of "woefully inadequate" funding and support discussed in the Lerner Report. He lacked all of the resources that would be standard in any capital proceeding today. Lacking both training and any knowledge of the <u>Skipper</u> decision, counsel presented the type of mitigation that was characteristic of the era. He called defendant's relatives, all of whom gave abbreviated testimony about defendant's character and asked for mercy. A0528 (N.T. 2/25/21 at 123).

In view of the foregoing, where one juror could have viewed defendant's prison records as positive and accepted the opinions of reputable experts who predicted (accurately) that he would become a well-adjusted inmate, defendant has demonstrated a reasonable probability of a different outcome. The Commonwealth respectfully requests this Court to grant penalty phase relief.

**CONCLUSION**

For the above-stated reasons, the Commonwealth requests this Court

to grant habeas corpus relief in the form of a new penalty phase hearing.


Respectfully submitted,


/s/Paul M. George

PAUL M. GEORGE
*Asst. Supervisor, Law Division*

NANCY WINKELMAN
*Supervisor, Law Division*
CAROLYN ENGEL TEMIN
*First Assistant District Attorney*
LAWRENCE S. KRASNER
*District Attorney of Philadelphia*

## COMBINED CERTIFICATIONS

1. I am a member of the bar of the United States Court of Appeals for the Third Circuit. 3d Cir. L.A.R. 28.3(d).

2. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,230 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

3. I certify that today I served a copy of this brief on all counsel electronically through this Court's docketing system.

4. The text of the electronic brief is identical to the text in the paper copies. 3d Cir. L.A.R. 31.1(c)

5. The Carbon Black Cloud virus detector has been run on this file and no virus was detected. 3d Cir. L.A.R. 31.1(c).

6. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in fourteen-point Georgia font.

February 6, 2023

/s/ *Paul M. George*
PAUL M. GEORGE