# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

No. 22-9001

---

ROBERT WHARTON,

Appellant

v.

SUPERINTENDENT GRATERFORD SCI, et al.,

Appellees

---

Appeal from Order of The Honorable Mitchell S. Goldberg, United States District Court, Eastern District of Pennsylvania Entered on May 11, 2022 in Civil Action No. 2-01-cv-06049, Denying Habeas Relief

---

## BRIEF OF *AMICUS CURIAE*, THE OFFICE OF ATTORNEY GENERAL, IN SUPPORT OF AFFIRMANCE OF DISTRICT COURT'S RULING

MICHELLE A. HENRY
Attorney General
MICHELE K. WALSH
Executive Deputy Attorney General
RONALD EISENBERG
Chief Deputy Attorney General
Appeals Section
HUGH BURNS
Assistant Chief Deputy Attorney General
Appeals Section
CARI L. MAHLER
Senior Deputy Attorney General

Criminal Law Division
1000 Madison Avenue, Suite 310
Norristown, PA 19403
(610) 631-6552
cmahler@attorneygeneral.gov

# TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS ....................................................................... iii

STATEMENT OF INTEREST .............................................................1

I.   INTRODUCTION .................................................................2

II.  PROCEDURAL HISTORY LEADING UP TO EVIDENTIARY
     HEARING ...........................................................................3

     A. Wharton's Capital Trials & State Court Proceedings ...........................3

     B. Wharton's Habeas Proceedings .........................................................5

         1. Pre-Remand Proceedings .............................................5

         2. Post-Remand Concession Efforts & Proceedings .........................6

         3. The Extensive Evidentiary Hearing ...........................................10

III. AFTER AN EVIDENTIARY HEARING, THE DISTRICT COURT
     PROPERLY FOUND THAT WHARTON FAILED TO SHOW
     THAT TRIAL COUNSEL WAS INEFFECTIVE. .................................11

     A. Trial Counsel's Performance in Not Opening the Door to
        Wharton's 1986 City Hall Escape and Two 1989 Misconducts
        for Possession of Implements of Escape Was Objectively
        Reasonable. ....................................................................12

         1. Wharton's 1986 Escape From City Hall ......................................13

         2. Wharton's Two May 1989 Implements of Escape
            Misconducts ...........................................................16

             a. May 15, 1989 Misconduct for Makeshift Handcuff Key ........16

             b. May 19, 1989 Implements of Escape Hidden in Legal
                Binding ...............................................................19

3. The Expert Witnesses Who Found That Wharton Had Negative Prison Adjustment .......................................20

   a. Former PA DOC Secretary of Corrections Jeffrey A. Beard, Ph.D. ........................................................20

   b. Forensic Psychiatrist Dr. John O'Brien, II .............24

4. Opening the Door to the "Positive" Prison Adjustment Would Have Had a Detrimental Impact on Trial Counsel's Strategy and Arguments at the Penalty Phase. ...........................27

B. The District Court Properly Found That Wharton Failed to Establish a Reasonable Probability That the Outcome of His Penalty Phase Would Have Been Different if Only the Jury Had Heard Evidence of His "Positive" Prison Adjustment. .....................33

1. The Penalty Phase Evidence .......................................34

2. The Irrelevant Jury Deliberations .............................39

3. Attempt to Extend the Relevant Time Period ............41

IV. WHARTON HAD A FULL AND FAIR OPPORTUNITY TO LITIGATE HIS PRISON ADJUSTMENT CLAIM BEFORE THE DISTRICT COURT. ...............................................................42

A. Extent of Amicus Participation .........................................44

B. Rejection of Link "Stipulation" ........................................47

C. Testimony of Victims' Family at the Hearing ...................49

D. "Frustration" with the DAO Concession...........................50

CERTIFICATIONS OF COMPLIANCE.................................................54

CERTIFICATE OF SERVICE.............................................................55

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*Alexander v. Hall*,
   64 F.R.D. 152 (D.S.C.1974)....................................................................45

*Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*,
   272 F. App'x 817 (11th Cir. 2008) .......................................................45

*Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*,
   793 F.3d 313 (3d Cir. 2015).................................................................43

*Baker v. Barbo*,
   177 F.3d 149 (3d Cir. 1999)..................................................................33

*Black Hills Inst. of Geological Research v. U.S. Dep't. of Justice*,
   978 F.2d 1043 (8th Cir. 1992)...............................................................45

*Bryan v. Bobby*,
   843 F.3d 1099 (6th Cir. 2016)...............................................................38

*Bucklew v. Luebbers*,
   436 F.3d 1010 (8th Cir. 2006)...............................................................38

*Budiyono v. Atty. Gen. of U.S.*,
   181 F. App'x 332 (3d Cir. 2006) ...........................................................48

*Burger v. Kemp*,
   483 U.S. 776 (1987)...............................................................................30

*Commonwealth v. Brown*,
   196 A.3d 130 (Pa. 2018) ..................................................................7, 51

*Commonwealth v. Wharton*,
   607 A.2d 710 (Pa. 1992) .........................................................................4

*Dorsey v. Vandergriff*,
   30 F.4th 752 (8th Cir. 2022), *cert. denied*,
   2023 WL 2123837 (U.S. Feb. 21, 2023) .............................................37

*Hard Drive Prods., Inc. v. Does 1-1,495*,
    892 F. Supp. 2d 334 (D.D.C. 2012)...................................................44

*Harrington v. Richter*,
    562 U.S. 86 (2011)..............................................................11, 40

*Hoptowit v. Ray*,
    682 F.2d 1237 (9th Cir. 1982), *abrogated on other grounds by*
    *Sandin v. Conner*, 515 U.S. 472 (1995)...............................................45

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999), *amended*,
    199 F.3d 158 (3d Cir. 2000)........................................................43

*Jermyn v. Horn*,
    266 F.3d 257 (3d Cir. 2001)........................................................33

*Liberty Res., Inc. v. Philadelphia Housing Auth.*,
    395 F. Supp. 2d 206 (E.D. Pa. 2005)................................................46

*Liljeberg v. Health Servs. Acquisition Corp.*,
    486 U.S. 847 (1988)...............................................................43

*Liteky v. United States*,
    510 U.S. 540 (1994)............................................................42, 52

*Massachusetts v. Microsoft Corp.*,
    373 F.3d 1199 (D.C. Cir. 2004) ....................................................45

*Morgan v. Branker*,
    2012 WL 2917841 (W.D.N.C. July 17, 2012)...........................................30

*Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J.*,
    940 F.2d 792 (3d Cir. 1991)........................................................45

*Peterka v. McNeil*,
    532 F.3d 1199 (11th Cir. 2008).....................................................30

*Russell v. Bd. of Plumbing Examiners of Cty. of Westchester*,
  74 F. Supp. 2d 349 (S.D.N.Y. 1999), *aff'd*,
  1 F. App'x 38 (2d Cir. 2001). .............................................................46

*Scott v. Diaz*,
  2016 WL 8969577 (C.D. Cal. Dec. 16, 2016),
  *report and recommendation adopted*,
  2017 WL 2177984 (C.D. Cal. May 16, 2017) ....................................32

*Securacomm Consulting, Inc. v. Securacom, Inc.*,
  224 F.3d 273 (3d Cir. 2000).............................................................43

*Sibron v. New York*,
  392 U.S. 40 (1968).........................................................................51

*Strickland v. Washington*,
  466 U.S. 668 (1984)..................................................................passim

*Thompson v. Comm'r of Soc. Sec.*,
  425 F. App'x 98  (3d Cir. 2011) ......................................................43

*Trice v. Ward*,
  196 F.3d 1151 (10th Cir. 1999)........................................................38

*United States v. American Telephone and Telegraph Co.*,
  1976 WL 1321 (D.D.C. 1976)..........................................................45

*United States v. Brown*,
  No. 21-5716, 2022 WL 3211096 (6th Cir. Aug. 9, 2022)...................47

*United States v. CVS Health Corp.*,
  2019 WL 2085718 (D.D.C. May 13, 2019).......................................45

*United States v. Gray*,
  878 F.2d 702 (3d Cir. 1989)............................................................12

*United States v. Hooker Chemicals & Plastics Corp.*,
  101 F.R.D. 451, 459 (W.D.N.Y. 1984), *aff'd*,
  749 F.2nd 968 (2d Cir. 1984)...........................................................45

*United States v. Kauffman*,
  109 F.3d 186 (3d Cir. 1997) ...............................................................12

*Wesson v. Shoop*,
  847 F. App'x 325 (6th Cir. 2021) ......................................................30

*Wharton v. Vaughn*,
  2022 WL 1488038 (E.D. Pa. May 11, 2022) ................................passim

*Wharton v. Vaughn*,
  722 F. App'x 268 (3d Cir. 2018) ...........................................6, 44, 47

*Wiggins v. Smith*,
  539 U.S. 510 (2003).............................................................................33

*Williams v. Beard*,
  637 F.3d 195 (3d Cir. 2011) ..............................................6, 33, 34, 37

*Wong v. Belmontes*,
  558 U.S. 15 (2009)........................................................................29, 33

*Young v. United States*,
  315 U.S. 257 (1942).............................................................................51

## <u>Statutes</u>

18 P.S. § 11.201 ....................................................................................49

18 P.S.  § 11.213(b), (e), (f) .................................................................49

18 U.S.C. § 3771(a)(3)-(4), (8), (b)(1) .................................................49

18 U.S.C. § 3771(a), (b)(2) ...................................................................49

28 U.S.C. § 2254 .....................................................................................9

42 Pa.C.S. § 9711(d)(10) .........................................................................5

42 Pa.C.S. § 9711(d)(6) ...........................................................................5

42 Pa.C.S. § 9711(e)(4)............................................................................5

42 Pa.C.S. § 9711(e)(8)...........................................................................................5

**<u>Other Authorities</u>**

Blacks's Law Dictionary 1427 (7th ed.1999).........................................................48

## **STATEMENT OF INTEREST**

The Pennsylvania Office of Attorney General is the *amicus curiae* in this appeal. The District Court directed the Office of Attorney General to participate as an *amicus curiae* when the District Attorney's Office repeatedly tried to concede penalty phase relief without providing a sufficient legal and factual basis. As a result of the amicus' involvement, the District Court was provided with Wharton's escape evidence that directly refuted his claim of positive prison adjustment and which neither party had disclosed to the Court.

The Office of Attorney General, in essence the "appellee" in this case, has an interest in ensuring that this Court is aware of all the relevant facts supporting affirmance of the District Court, where both parties are challenging the denial of relief. *See* 71 P.S. § 732-206 (The Attorney General is the chief law enforcement officer for the Commonwealth). By Order dated September 13, 2022, this Court granted the Office of Attorney General's motion for leave to file an amicus brief.

No party's counsel has authored this brief in whole or in part, and no party, party's counsel, or person has contributed money to the preparation of this brief.

## I.    INTRODUCTION

This case involving the Office of Attorney General (OAG) as *amicus curiae* is like no other. In 2018, this Court remanded for an evidentiary hearing on whether trial counsel was ineffective for failing to present evidence of Wharton's alleged positive prison adjustment. At that point, the Philadelphia District Attorney's Office (DAO), having worked for decades to uphold the judgment, abruptly reversed course. It tried to concede the ineffectiveness claim without providing a basis but representing it had conducted a "careful review." The District Court directed the *amicus curiae* to investigate the claim, which revealed escape evidence (Wharton's violent premediated escape attempt from City Hall and two prison misconducts for possession of implements of escape). Despite this evidence, the DAO continued to advocate for Wharton. The District Court ordered an evidentiary hearing to ensure a complete presentation of the facts.

The evidence presented at the hearing demonstrated that, based on Wharton's City Hall escape attempt and his prison misconducts for possessing implements of escape, trial counsel's not presenting Wharton's "positive" prison adjustment was objectively reasonable. Moreover, as the District Court found, given Wharton's terrorizing of the victims during the months leading up to the murders, the heinous nature of the crime, and the aggravating circumstances, there was no probability that the jury would have imposed life imprisonment if only it had heard about Wharton's

2

"positive" prison adjustment, which was substantially outweighed by his negative prison behavior.

The District Court should be affirmed.

## II.    PROCEDURAL HISTORY LEADING UP TO EVIDENTIARY HEARING

### A.    Wharton's Capital Trials & State Court Proceedings

Five months before the murders of Bradley and Ferne Hart, Wharton began his crime spree of terrorization, destruction, vandalization and burglaries of the victims' home and church over a debt he believed was owed to him (N.T. 12/14/92, 79-110). Wharton first burglarized the Harts' home on August 14, 1983. When he returned on August 22, 1983, Wharton vandalized the Harts' home by slashing furniture, ransacking closets, mutilating family photographs, pouring different liquids such as bleach, paint, and oil throughout the house, and defecating and urinating on the floors. Wharton also left a doll with a rope tied around its neck and a taunting note for Bradley Hart. On September 4, 1983, Wharton burglarized Reverend Samuel Hart's (Bradley's father) church, stealing cash and property and pinning a photograph of Bradley to a wall with a letter opener.

Finally, in the late evening of January 30, 1984, Wharton and his cohort forced their way into the Harts' home at knifepoint. They coerced Bradley Hart into writing a check to settle the purported debt. Next, the two men tied up the Harts and watched television for hours. Eventually, Wharton took Ferne Hart upstairs where he bound

her hands and legs, covered her eyes, nose and mouth with duct tape, strangled her with a necktie, and drowned her in a bathtub. Meanwhile, Wharton's co-conspirator took Bradley Hart to the basement, where he forced him to lie with his face in a pan of water, placed his foot on Bradley Hart's back, and strangled him to death with an electrical cord. Wharton and his cohort turned off the heat in the house and fled, leaving the Harts' seven-month-old daughter alone in the home in subfreezing temperatures. Days later, Reverend Hart discovered the victims' bodies and the infant suffering from dehydration and neglect.

Wharton confessed to the crimes. He detailed his murder of Ferne Hart: "I had put this tape around her face from her eyebrows down to her chin while we was in the bathroom first before I dunked her head in the water. I held her head down in the water till the bubbles stopped after a while" (N.T. 12/17/92, 8-18). Wharton further told police that he tried to strangle Ferne Hart with a tie before drowning her in the tub. Wharton explained that he killed the victims "cause they knew me and would turn us in" (N.T. 12/17/92, 8-22).

In 1985, the jury sentenced Wharton to death for each of the murders. The Supreme Court of Pennsylvania affirmed Wharton's convictions but vacated the death sentence due to an erroneous jury charge. *Commonwealth v. Wharton*, 607 A.2d 710 (Pa. 1992).

Wharton's second penalty hearing began on December 14, 1992. He presented two mitigating circumstances: (1) his age at the time (twenty) (42 Pa.C.S. § 9711(e)(4)); and (2) the "catch-all mitigator" of any other evidence "concerning the character and record of the defendant and the circumstances of his offense" (42 Pa.C.S. § 9711(e)(8)) based on testimony from family members regarding his positive attributes before the murders and during the years between his two penalty phase hearings.

On December 23, 1992, the jury unanimously concluded that the two aggravators it found—(1) that Wharton committed the killings during the perpetration of a felony (42 Pa.C.S. § 9711(d)(6)); and (2) that Wharton had been convicted of another offense punishable by life imprisonment or death (42 Pa.C.S. § 9711(d)(10))—outweighed the "catch-all" mitigating circumstance that it found. 42 Pa.C.S. § 9711(e)(8)). The jury sentenced Wharton to death for each of the victim's murders.

### B.    Wharton's Habeas Proceedings

### 1.    Pre-Remand Proceedings

In 2003, Wharton filed a petition for writ of habeas corpus raising twenty-three claims, one of which was that trial counsel was ineffective for failing to present evidence of his alleged "positive adjustment" in prison during the years between his

two penalty phase hearings (1985 to 1992). On August 16, 2012, the District Court denied relief and issued a certificate of appealability ("COA") on two claims.

This Court expanded the COA to include a third claim that trial counsel was ineffective for failing to introduce mitigating evidence regarding Wharton's positive adjustment during the time between his two penalty phase hearings.

On January 11, 2018, this Court affirmed with respect to the first two issues but remanded for an evidentiary hearing regarding the claim that trial counsel was ineffective for failing to present evidence of Wharton's positive prison adjustment from the time in between his penalty hearings. It specifically noted that the question was not merely "the mitigation evidence that went unmentioned in the first instance; we *must* also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony." *Wharton v. Vaughn*, 722 F. App'x 268, 282-83 (3d Cir. 2018) (quoting *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011)) (emphasis added).

### 2.     Post-Remand Concession Efforts & Proceedings

On remand, the DAO filed a Notice of Concession indicating that it was conceding relief on this penalty phase claim and that it would not pursue the death penalty in state court. The Notice of Concession provided that the decision to concede was made "[f]ollowing review of this case by the Capital Case Review Committee of the Philadelphia District Attorney's Office, communication with the

victims' family, and notice to [Wharton's] counsel" (ECF No. 155). As noted by the District Court, the Concession Notice "provided no factual or legal analysis as to the District Attorney's basis for this complete about-face, and no explanation as to why, after decades of advocating for the death penalty, the District Attorney had now reached the conclusion that a Sixth Amendment violation had occurred due to a failure on trial counsel's part to introduce positive prison adjustment evidence." *Wharton v. Vaughn*, 2022 WL 1488038, at *3 (E.D. Pa. May 11, 2022). *See Commonwealth v. Brown*, 196 A.3d 130, 144-46 (Pa. 2018) (holding that the DAO has no discretion to alter a capital jury's verdict by concession, and that vacating a jury's death sentence requires independent judicial review).

The parties submitted a Proposed Order vacating the death sentence based on the District Court's "careful and independent review of the parties' submissions and all prior proceedings in this matter[.]" *Wharton*, 2022 WL 1488038, at *3 (citing ECF No. 156).

By Order dated March 4, 2019, the District Court indicated that the Proposed Order failed to set out reasons why the merit of Wharton's remaining penalty phase claim "is apparent on the current record, such that the evidentiary hearing ordered by the Third Circuit is not required." The District Court concluded that it could not make an independent evaluation of the merits of the penalty phase claim on the current record and permitted the parties to further brief the issue (ECF No. 160).

7

In accordance with that Order, the DAO asserted that Wharton's remaining penalty phase claim was "not lacking in merit" because trial counsel had provided a declaration stating "that he had no strategy for not presenting adjustment evidence" and that he could have argued Wharton's prison records showed he "posed no danger to inmates or staff if he were sentenced to life." The DAO represented that it had "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in *Strickland*" (ECF No. 162). There was no mention of Wharton's escape attempts.

On May 7, 2019, the District Court found that the DAO "fails to indicate whether it did any investigation regarding [Wharton's] adverse or negative adjustment to prison," fails to "comment on the expert report submitted by [Wharton]," and appears to have "accepted the additional evidence offered by [Wharton] at face value, without exploring whether contrary views may be viable and worth considering." Given the lack of information provided by the DAO, the District Court directed the OAG, as *amicus curiae*, to investigate and provide any evidence of Wharton's prison adjustment, including contrary facts.

The OAG's investigation revealed significant evidence neither party had revealed. Specifically, Wharton had engaged in a premeditated escape from a City Hall court appearance, during which he had to be shot twice to be apprehended, and

three years after that he had prison misconducts for possessing implements of escape, including a makeshift handcuff key.

The OAG also revealed to the District Court that Lisa Hart-Newman, the sole surviving victim of Wharton's crimes who had been left to freeze to death in her parents' home after they were murdered, and other siblings of the deceased, were never contacted about the DAO's new position. Indeed, contrary to the DAO's claim to have relied on "communication with the victims' family," the family was vehemently opposed to relief.

The escape evidence had no effect on the DAO. It did not advise the District Court that it had somehow missed that evidence during its "careful review." It did not reconsider its concession, but continued to assert that Wharton's claim of "positive" prison adjustment warranted relief. Both parties continued to insist that penalty phase relief was appropriate without further analysis and objected to the *amicus curiae* participating in the hearing.

By Memorandum Opinion dated February 12, 2020, the District Court concluded that, "[g]iven the District Attorney's reluctance to fully investigate this matter and explain its concession of the death penalty," it was "necessary" for the OAG to participate in the hearing and call and cross-examine witnesses (ECF No. 187). It further noted that, given the statutory obligation in 28 U.S.C. § 2254 proceedings to afford victims an opportunity to be heard where sentencing or release

is involved, it would admit "evidence of the District Attorney's communication with the victims' family members and the family's view on the proposed concession of relief." *Wharton*, 2022 WL 1488038, at *4.

### 3.    The Extensive Evidentiary Hearing

During the 5-day hearing that occurred over the course of six months (February 2021 to August 2021), Wharton had a full and fair opportunity to litigate his prison adjustment claim. While represented by experienced capital habeas counsel, Wharton presented testimony from numerous witnesses (former trial counsel, a mental health expert and a corrections expert), and introduced binders of prison records.

In the hearing, the DAO functioned as Wharton's co-counsel. It continued to argue that the District Court should accept its concession, and asserted that it had been fully aware of Wharton's escape conviction when deciding to make that concession (N.T. 2/25/21, 98; N.T. 5/11/21, 66). It joined Wharton's counsel in cross-examining witnesses presented by the OAG, objecting to questions the OAG asked, and arguing against OAG positions.

At the conclusion of the evidentiary hearing, the parties asked the District Court to accept their proposed "stipulation" to the 6-page declaration of Cynthia Link, a defense corrections expert who did not testify at the evidentiary hearing and

thus was not subject to cross-examination (N.T. 8/5/21, 128-29). The District Court declined.

After careful consideration of the evidence presented at the evidentiary hearing, the District Court found that Wharton failed to show that trial counsel was ineffective for failing to present evidence of his "positive" prison adjustment during the time frame between his two penalty phase hearings (1985-1992).

## III.    AFTER AN EVIDENTIARY HEARING, THE DISTRICT COURT PROPERLY FOUND THAT WHARTON FAILED TO SHOW THAT TRIAL COUNSEL WAS INEFFECTIVE.

To prevail on his ineffectiveness claim, Wharton had to show that: (1) counsel's performance was deficient in that it fell below "an objective standard of reasonableness"; and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

The District Court properly found that Wharton failed to meet this stringent burden. *See Harrington v. Richter*, 562 U.S. 86, 109-10 (2011) ("After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

11

A.    **Trial Counsel's Performance in Not Opening the Door to Wharton's 1986 City Hall Escape and Two 1989 Misconducts for Possession of Implements of Escape Was Objectively Reasonable.**

Showing that trial counsel's conduct "fell below an *objective* standard of reasonableness," *Strickland*, 466 U.S. at 688 (emphasis added), "requires that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. The law presumes counsel was effective:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Id.* at 689. In accordance with these standards, it is "only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997) (quoting *United States v. Gray,* 878 F.2d 702, 711 (3d Cir. 1989)).

The evidence established that trial counsel's performance did not fall below an objective standard of reasonableness. To the contrary, if counsel had opened the door with the "positive" prison adjustment evidence, the Commonwealth would

12

have rebutted with evidence of negative prison adjustment that would have been detrimental to the defense and would have significantly impeded trial counsel's ability to make certain vital arguments in closing when asking the jury to spare his client's life.

### 1.    Wharton's 1986 Escape From City Hall

On April 21, 1986, less than a year after having been sentenced to death by a jury, Wharton attempted to escape the custody of Philadelphia deputy sheriffs when he was being escorted out of a second floor courtroom in City Hall following sentencing in an unrelated robbery case. OAG Ex. 6-14.

When exercising his right to allocution, Wharton acknowledged that he had caused a lot of people pain and suffering, that he was sorry for his crimes and that "any time I serve, I will use to better myself." Minutes later, however, at approximately 5:00 p.m., he pushed a deputy sheriff into the closed elevator door and fled down a public stairwell from the second floor to the first floor of City Hall. During his attempted escape, Wharton used a handcuff key to open his handcuffs. The deputy sheriff fired two shots at Wharton to prevent his escape, wounding him in the thigh and buttocks. Wharton was apprehended on the sidewalk outside of City Hall. On December 3, 1986, Wharton pled guilty to escape and was sentenced to one to three years imprisonment. OAG Ex. 6-14 & 24.

If trial counsel had opened the door with "positive" prison adjustment evidence, the Commonwealth could have presented testimony from the Philadelphia deputy sheriffs about the 1986 escape, which unfolded in the very same City Hall courthouse in which the jurors themselves were sitting (N.T. 2/25/21, 116). Such testimony would have included evidence of the handcuff key that Wharton was hiding at the same moment he was claiming remorse for his crimes. The evidence would also have shown that the escape resulted in gunfire in the middle of the city during rush hour, and that Wharton was apprehended only because he was shot twice. The Commonwealth also could have introduced the court file reflecting that Wharton pled guilty to the escape (N.T. 2/25/21, 199-200; OAG Ex. 11-13).

The parties engage in numerous efforts to try to minimize and even exclude the escape attempt from consideration.

They assert that because the DAO never mentioned it *before* this Court's 2018 remand for an evidentiary hearing, this confirms its "irrelevance" and "limited value" to his prison adjustment claim. This argument ignores that, in the state court PCRA proceedings and the pre-remand years of proceedings in the District Court, there was no need to rebut Wharton's positive prison adjustment theory. While his 125-page amended PCRA petition mentioned positive prison adjustment as one of 23 claims, the court dismissed it without an evidentiary hearing, and there was no

occasion to offer refutation evidence. The same is true of the habeas proceedings prior to the remand.

Wharton was the moving party, and it was his burden to proffer evidence in support of his claim of positive prison adjustment. The PCRA court and the District Court both found that what he proffered was insufficient to warrant relief. The situation changed when this Court remanded *for an evidentiary hearing* to examine the issue more closely ("we must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony"). This Court and the District Court both pointed out the need for further investigation of the prison adjustment claim that had been presented and remanded. Because the DAO did not conduct that investigation, the District Court asked the OAG to review the claim and present any contrary facts.

Moreover, while the actual claim for decades has been Wharton's prison adjustment during the time period between his two penalty hearings, the parties now try to recast the claim as ineffectiveness for failing to present positive prison adjustment *in state custody* before his 1992 penalty phase hearing (DAO Brief, 1, 9; Wharton Brief, 20, 46). This is an obvious attempt to exclude from consideration Wharton's April 1986 escape from City Hall while he was in county custody, before he was placed on death row in the DOC in September 1986.

15

Wharton relatedly suggests that the escape attempt may not have been admissible at the penalty phase "to rebut evidence of behavior in *state* prison" (Wharton Brief, 22-23) (emphasis added). Again, the claim is alleged ineffectiveness for failing to present evidence of positive prison adjustment during the time between his two penalty phase hearings (1985-1992); it was not limited to his behavior in state custody. The escape evidence surely would have been admissible anti-mitigation to refute a claim of positive prison adjustment (*see Commonwealth v. Basemore*, 582 A.2d 861, 870 (Pa. 1990)), and the District Court gave it the appropriate weight when assessing the prison adjustment claim.

### 2. Wharton's Two May 1989 Implements of Escape Misconducts

In May of 1989, three years after entering the DOC (midway through the six-year time period between his two penalty phase hearings), Wharton was still making efforts to escape custody through his makeshift handcuff key and other hidden implements of escape. These misconducts were far from a "slip," as described by Wharton.

### a. May 15, 1989 Misconduct for Makeshift Handcuff Key

On May 15, 1989, Corrections Officer Daniel Hayes' routine security search of Wharton's single cell in the Restricted Housing Unit ("RHU") revealed that he had hidden two pieces of metal antenna in the mounting of a toilet. One of the pieces of antenna had been fashioned into a handcuff key. Wharton was charged with

"possession of contraband, implements of escape," a Class I misconduct (N.T. 3/16/21, 154-61, 193; OAG Ex. 16-17a).[1]

CO Hayes found Wharton's misconduct serious because "[y]ou don't expect an inmate to have the cuff key;" inmates in the RHU are restrained for a reason and having a handcuff key that can remove their cuffs poses a danger to the safety of those in the institution. During his 28 years as a corrections officer in the DOC, this particular misconduct by Wharton was the only time that CO Hayes, who regularly searched the mounting bolts of the toilets in the RHU cells, found a makeshift handcuff key and one that "looked like it could have worked" (N.T. 3/16/21, 151-66; N.T. 5/11/21, 23).

Following a disciplinary hearing on May 17, 1989, Hearing Examiner George Conrad found Wharton guilty of the charge, concluding that the confiscated physical evidence -- which he personally examined at the hearing -- "clearly represents a handcuff key" and it was "more likely than not that the key was possessed and under

---

[1] The DOC's Inmate Discipline Procedures Manual (DC-ADM 801) describes an "implement of escape" as items "which in the hands of an inmate present a threat to the inmate, others or to the security of the facility" (N.T. 5/11/21, 42-43; OAG Ex. 27). Under the 801 Manual, possession of contraband implements of escape is a Class I Category B misconduct because it is a serious threat to the prison staff, the inmate, other inmates and the community at large outside the prison. The only charges more severe than the Class 1 Category B misconducts are the Class I Category A misconducts identified as first degree felonies under the Pennsylvania Crimes Code (murder, rape, arson, robbery, etc.) (N.T. 3/16/21, 158-60, 194; N.T. 5/11/21, 37-44; OAG Ex. 27).

the control of Wharton," who had occupied a single cell for several months. Wharton was sanctioned to 90 days of Disciplinary Custody ("DC") (N.T. 3/16/21, 190-200; OAG 17b-c).[2]

George Conrad delineated the numerous reasons why he discredited Wharton's proffered version of events (*i.e.*, the contraband must have been in the toilet mounting of his cell before he got there): The CO had no reason to fabricate finding the handcuff key; the key was found in a cell occupied solely by Wharton; and in the RHU, a makeshift handcuff key is not something an inmate would leave behind, as it is a valuable commodity to either use or sell (N.T. 3/16/21, 201-02).

As the hearing examiner for this particular misconduct and having been a hearing examiner in the DOC for 10 years, Conrad found Wharton's misconduct to be serious, stating "[t]here can't be any good reason for an inmate to . . . make a handcuff key and free himself from handcuffs. . . . When you take your handcuffs off, you're going to assault. I mean, it's basically -- for me it spells you're going to assault someone. Either staff or another inmate" (N.T. 3/16/21, 204-05).[3]

---

[2] DC status is the most restrictive status of confinement to which an inmate found guilty of a Class 1 misconduct may be committed. An inmate on DC status is housed in a separate section of the RHU, and loses various privileges, including the loss of radio, television, telephone calls, and personal property (N.T. 3/16/21, 203-04; N.T. 5/11/21, 38-45).

[3] As of May of 1989, George Conrad had seen handcuff keys on the corrections officers on a daily basis. Additionally, out of the thousands of misconducts over

On review, the Program Review Committee ("PRC")[4] found that "the misconduct is easily supported by the evidence" and that "[p]ossession of contraband such as a homemade handcuff key is an extremely serious misconduct." OAG Ex. 17e.

### b. May 19, 1989 Implements of Escape Hidden in Legal Binding

On May 19, 1989, just two days after Wharton was found guilty of the above charge, prison officials conducted a random search and discovered an additional 4" piece of broken metal antenna hidden in the binding of his legal material. Wharton again was charged with "possession of contraband, implements of escape." OAG Ex. 18-19a.

On May 23, 1989, the hearing examiner found Wharton guilty of the charge, noting that Wharton was in a single cell and had sole control over his possessions. The hearing examiner also referred to Wharton's previous misconduct, in which "a handcuff key was fashioned out of such a piece [of] material." Wharton again was sanctioned to 90 days of DC status. OAG Ex. 19b.

---

(continued . . . )
which he presided during his 10 years as a hearing examiner, he discovered an inmate had fashioned a handcuff key out of a piece of antenna only approximately ten times; it was uncommon (N.T. 3/16/21, 185-86, 199, 206).

[4] The PRC is comprised of upper level administrators, specifically two deputy superintendents and the classification and treatment manager or their designee if they are not available (N.T. 5/11/21, 40).

On June 2, 1989, the PRC sustained the action of the hearing examiner. The PRC found that "[i]t is quite credible and actual that the material was used to make a handcuff key," similar to what Wharton had done just days earlier. The PRC commented, "[s]ince the material was found in Mr. Wharton's cell and it is established that the material can be used as an implement of escape, the committee finds the evidence to be sufficient." OAG Ex. 19c-e.

Undoubtedly, if trial counsel had opened the door to the "positive" prison adjustment evidence, the Commonwealth could have rebutted by presenting testimony from corrections officers (such as CO Hayes), hearing examiners (such as George Conrad) and PRC members, introducing various prison disciplinary records, and displaying physical evidence (such as Wharton's confiscated makeshift handcuff key to compare to CO Hayes' actual DOC-issued handcuff key) pertaining to Wharton's implements of escape misconducts committed in the highly regimented environment of the RHU where Wharton was housed (N.T. 2/25/21, 174, 181-85, 191; N.T. 3/8/21, 22; N.T. 3/16/21, 166-67).

### 3. The Expert Witnesses Who Found That Wharton Had Negative Prison Adjustment

#### a. Former PA DOC Secretary of Corrections Jeffrey A. Beard, Ph.D.

Jeffrey A. Beard, Ph.D, who was the Secretary of Corrections for the PA DOC for 10 years, whose expansive career in the DOC spanned 38 years (1972 to 2010),

and who subsequently was the Secretary of Corrections for the California Department of Corrections and Rehabilitation Headquarters, opined that Wharton had negative prison adjustment (N.T. 5/11/21, 10-15, 62; OAG Ex. 4-5).

Beard testified that the first thing he observed was Wharton's "very serious" "premeditated escape attempt" from the Philadelphia courtroom, where he used a handcuff key to escape his handcuffs and was possibly feigning an arm injury. Wharton shoved a deputy sheriff into an elevator door, ran down the stairs, got outside the building, and was shot twice during the process "which put both himself and everybody around at serious risk. And the fact that it occurred at 5:00 when people would be going home would even increase the risk to bystanders in a situation like that" (N.T. 5/11/21, 18, 27-28).

Beard also found it "pretty serious" that Wharton had six misconducts during the 1986 to 1992 time period (the last of which occurred in 1992), demonstrating his "continuing misbehavior during the entire six years." In particular, Beard viewed Wharton's two 1989 misconducts for implements of escape as "extremely serious" because of the manufactured handcuff key made out of antenna found in his cell and the additional antenna material found in his personal documents just four days later. Handcuffs are used to provide security when escorting capital inmates within the institution "so for an inmate to have possession of a handcuff key, we've to consider it to be very, very serious." Relating that back to Wharton's 1986 City Hall escape

when he also had a handcuff key, Beard found Wharton's misconduct "even more serious, because, you know, I've always found that one of the best predictors of future behavior is past behavior. . . . And so in the past he had a handcuff key and used it" (N.T. 5/11/21, 17-20).

In addition, Beard explained how Wharton's remarks at the robbery sentencing on April 21, 1986—when he acknowledged that he caused a lot of people pain and suffering, that he was sorry for his crimes and that "any time I serve, I will use to better myself"—just minutes before he escaped custody "makes things that much worse." Beard explained the impact this behavior by Wharton has when viewing his subsequent behavior in the DOC:

> … while he was in the DOC, and you look at things like his, you know, relationship counselors and psychiatrists, even though they were very superficial, they -- he was generally pleasant and contrite, while here's an individual who can be contrite and everything else, and still be planning something very serious. So it throws into question everything that you see going on with Mr. Wharton during that six-year period of time while he was in the Pennsylvania Department of Corrections.

(N.T. 5/11/21, 47-48).

Beard testified that the 1986 escape attempt in conjunction with the two May 1989 possession of contraband implements of escape misconducts "form the greater part of my opinion that he had negative adjustment during that period of time" because "you have somebody who is serving time for a very serious crime, who is trying to get away into the community and put the community at risk. And then

several years later, is caught with material that could allow him to make the same kind of attempt again" (N.T. 5/11/21, 46, 66).

In Beard's extensive experience in the DOC, the fact that there was no indication in the records that Wharton ever tried to use the makeshift handcuff key or the pieces of antenna to try to escape did not lessen the severity of these two misconducts. "[I]f you have no intention of using it why would you have it, number one, and number two, he simply may not have had the opportunity to do it. We don't know, and we don't know what he was thinking, because he refused to talk to the PRC when they tried to engage him in that matter" (N.T. 5/11/21, 46-47).

Beard, who sat on the PRC for 9 years while a Deputy Superintendent at SCI Rockview, found Wharton's conduct before the PRC regarding his two serious misconducts created "a very concerning situation, and a very negative situation in my view" (N.T. 5/11/21, 20-21). Beard referred to PRC review records reflecting Wharton's unwillingness to discuss the implements of escape misconducts and accept responsibility for them (OAG Ex. 37a-37c; N.T. 5/11/21, 52-56).[5]

---

[5] As noted by the District Court, Wharton's refusal to accept responsibility for his actions in connection with his 1989 implements of escape misconducts is consistent with his 1986 DOC classification assessment. The classification summary provided that Wharton "used a great deal of denial and rationalization" when recounting the victims' murders, "impresses as a sociopath," and was an extremely high public risk because "he admits attempting to escape from Sheriff's on 4/21/86." *Wharton*, 2022 WL 1488038, at *5-6 (citing OAG Ex. 39).

In contrast to Beard, defense corrections expert Maureen Baird -- who never worked in the PA DOC in any capacity (N.T. 8/5/21, 80-83) -- opined that Wharton overall had positive prison adjustment. Baird minimized Wharton's escape misconducts because the makeshift key was not actually used to escape. While conceding that more weight must be placed on factors involving escape risk, a threat to the community at large, and whether the inmate has engaged in conduct that threatens the security of the institution, Baird chose to rely more on commonplace "positive" factors – e.g., Wharton's family ties, housing reports, educational efforts, and the PRC's periodic boilerplate statements that he was "polite" and had "satisfactory" adjustment – than his City Hall escape and his continued efforts to escape custody through implements of escape (N.T. 8/5/21, 95-97, 123-25).

The District Court's agreement with Jeffrey Beard's assessment is well supported by the facts.

### b. Forensic Psychiatrist Dr. John O'Brien, II

Dr. John O'Brien, an expert in psychiatry and forensic psychiatry, also opined that Wharton displayed negative prison adjustment during the 1986-1992 time period.

Dr. O'Brien found Wharton's 1986 escape from City Hall suggestive of "advanced planning" and a significant factor to consider in assessing his adjustment to prison. Dr. O'Brien cited Wharton's behavior during his April 21, 1986

sentencing hearing (when he apologized for his crimes and escaped custody moments later) to illustrate that Wharton's self-professions do not provide a reliable basis for assessing his risk of future problems or the adequacy of his prison adjustment. Wharton's conduct reflected that he is a planner and clever enough to keep his plans to himself and then surprise people (N.T. 3/8/21, 21-24).

Dr. O'Brien emphasized that Wharton's two 1989 implements of escape misconducts occurred in the middle of the relevant six-year time period, and were especially serious when viewed in the context of his 1986 City Hall escape attempt. Dr. O'Brien found no basis to conclude that Wharton made a good prison adjustment when halfway through the six-year time period he engaged in the same kind of behavior he had displayed during his 1986 escape attempt (N.T. 3/8/21, 42-43).

The District Court (and Dr. O'Brien) properly noted the critical flaw in defense expert Dr. Blumberg's opinion that Wharton had positive prison adjustment. Dr. Blumberg discounted Wharton's 1986 City Hall escape in his analysis. Dr. Blumberg repeatedly and conveniently testified that the "focus" of his assessment of Wharton's prison adjustment was on his time in *state custody* at SCI Huntingdon from September 1986 to 1992, *i.e.*, *after* the April 1986 City Hall escape (N.T. 2/25/21, 18, 21, 41-43, 50, 65, 67, 79; *See* N.T. 2/25/21, 43 - "I focused on his adjustment after that;" N.T. 2/25/21, 44 - my "focus on his adjustment began after he was placed at SCI Huntingdon which would've been in September of 86;" N.T.

2/25/21, 54 - "the focus of my assessment was on his adjustment to prison after he was confined at SCI Huntingdon"). To Dr. Blumberg, it was as if Wharton's escape from City Hall did not exist (*See* N.T. 2/25/21, 49 - testifying that he had no information that Wharton had poor prison adjustment *prior to* September of 1986).

Dr. O'Brien further found that Dr. Blumberg's failure to recognize the similarity and connection between Wharton's 1986 escape and 1989 implements of escape misconducts undermined the validity of his conclusions (N.T. 3/8/21, 21-23). With this "narrow focus," Dr. O'Brien opined, you only get a limited view of someone like Wharton (N.T. 3/8/21, 30-31).

Like Beard, Dr. O'Brien found that Wharton's refusal to accept responsibility for his misconducts, his "less than truthful" conduct before the PRC regarding the misconducts, and his unwillingness to communicate with the PRC about his misconducts demonstrated negative prison adjustment (N.T. 3/8/21, 25-27; N.T. 3/16/21, 76).

If trial counsel had opened the door to the "positive" prison adjustment, the Commonwealth could have rebutted with the above-referenced expert witness testimony and PRC records.[6]

---

[6] The DAO misstates that both amicus experts testified that Wharton's two 1989 implements of escape misconducts invalidated the remaining six years of his incarceration and showed that he did not adjust positively to prison. Both Beard and Dr. O'Brien testified that it was the 1986 escape attempt *in conjunction with* the two

**4.    Opening the Door to the "Positive" Prison Adjustment Would Have Had a Detrimental Impact on Trial Counsel's Strategy and Arguments at the Penalty Phase.**

Presenting the so-called positive prison adjustment evidence would also have negatively impacted trial counsel's strategy and arguments at the penalty phase.

Trial counsel's strategy at the penalty phase was to present evidence of Wharton's *positive* attributes through various family members (N.T. 2/25/21, 173-74). Consistent with that strategy, Wharton's brother testified that Wharton was athletic, "always kind," helpful, and that he looked up to Wharton (N.T. 12/18/92, 72-75). Wharton's brother-in-law testified that "you'd want your child to be like" Wharton in that he was "a loving person," a protective family member, helpful to others, an excellent athlete, a leader in the community, "very kind," humble, supportive, and giving (N.T. 12/18/92, 86-92). Wharton's aunt testified that Wharton was a "loveable," "innocent" and "wonderful" person who was artistic and creative (N.T. 12/18/92, 106-08). Wharton's sister testified that he was a good big brother and father-figure (N.T. 12/18/92, 112-14).

Wharton's mother testified that as a child Wharton was "bright," "artistic," "very kind," motivated, and helpful. He did not cause trouble. Wharton also helped her support and care for Wharton's father after he had a stroke and Wharton

---

(continued . . . )
1989 implements of escape misconducts that formed the majority of their opinion that Wharton had negative prison adjustment.

performed errands for elderly neighbors. Wharton's mother further testified that he excelled at sports, had "always been a kind hearted person," and helped her care for the children in her day care center. Wharton's mother pleaded for the jury to spare her son's life and sentence him to life imprisonment, *emphasizing that he would never be free from prison* (N.T. 12/21/92, 17-39).

In addition to presenting testimony from Wharton's family members regarding his positive attributes prior to the victims' murders, trial counsel presented testimony from family regarding his positive attributes while incarcerated. Wharton's cousin testified that, during the previous five years of Wharton's incarceration, he helped her with her hot dog cart business by creating menus and flyers to help her generate business. According to his cousin, for the prior ten years, Wharton was "just a real good human being." Wharton's sister-in-law also testified that, since his incarceration, Wharton had accepted religion into his life (N.T. 12/18/92, 95-101; N.T. 12/21/92, 9-11).

Trial counsel's strategy was to humanize Wharton by highlighting his positive attributes as a family member. Presenting tidbits of Wharton's "positive" behavior in prison in an attempt to add to this trial strategy would have been catastrophic for the defense. Had trial counsel presented records pertaining to Wharton's "positive" prison adjustment, he would have opened the door for the Commonwealth to rebut with the extensive damaging prison information detailed above.

As recognized by the District Court, the facts of Wharton's continuous efforts to escape during the relevant time period, while displaying superficially good prison behavior, "would have greatly undermined, rather than corroborated, Wharton's family members' testimony to his character. . . . The jury would be left with the distinct impression that Wharton's positive attributes could not be trusted." *Wharton*, 2022 WL 1488038, at *15.

Evidence of Wharton's April 1986 escape from City Hall, when he was brought to Philadelphia for sentencing in a robbery case, and his two 1989 implements of escape misconducts ***alone*** would have been detrimental to the defense strategy of portraying Wharton as a kind, loving, innocent, and helpful person. It would have undermined the strategy trial counsel did use at the penalty hearing. From a jury's perspective, attempts to escape custody are serious because they could potentially threaten the jurors themselves. It is not difficult to imagine a violent killer wanting revenge against the people who put him away.

If anything, the jury would likely have found the full prison records *aggravating* rather than mitigating. If trial counsel had opened the door to evidence of Wharton's bad prison adjustment, he would likely be facing a challenge for doing exactly what he is now challenged for not doing. *See Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (counsel was not ineffective for failing to present the additional mitigation evidence where "the worst kind of bad evidence would have come in with

the good" and "[t]he only reason it did not was because [counsel] was careful in his mitigation case"); *Burger v. Kemp*, 483 U.S. 776, 792 (1987) (counsel was not ineffective for declining to present mitigating evidence that might have opened the door to damaging rebuttal evidence).

Federal courts have declined to find trial counsel ineffective under similar circumstances where introducing the purported positive prison records would have opened the door to evidence adverse to the defendant. *See Wesson v. Shoop*, 847 F. App'x 325 (6th Cir. 2021) (counsel's decision not to present the defendant's prison records and expert testimony regarding prison culture at capital sentencing was reasonable and, thus, did not amount to ineffective assistance of counsel where records contained information about prior convictions, mixed work performance evaluations, and various disciplinary infractions, and proposed expert testimony could have done more harm than good for the defendant) (unpublished); *Morgan v. Branker*, 2012 WL 2917841, at *20 (W.D.N.C. July 17, 2012) (trial counsel reasonably declined to present records of the defendant's positive prison adjustment when doing so would have allowed the prosecutor to cross-examine DOC officials or introduce rebuttal evidence about, *inter alia*, the defendant's negative prison records detailing his infractions for fighting and disobeying orders); *see also Peterka v. McNeil*, 532 F.3d 1199 (11th Cir. 2008) (defense counsel did not perform deficiently in penalty phase by failing to introduce evidence of the defendant's prison

record as mitigation where the evidence was minimal, consisting only of corrections officer's testimony that the defendant had been "a little better" than the normal person incarcerated for violent crime, and that the defendant had tried to "act properly" in prison).

In zealously arguing to the jury during his closing argument that a sentence of life in prison was appropriate, trial counsel repeatedly emphasized that, if Wharton was sentenced to life imprisonment, he would never leave the prison. Trial counsel impressed upon the jury that Wharton *would remain there for the rest of his life* (N.T. 12/21/92, 70, 89-90). Evidence of Wharton's complete prison adjustment record, however, would have led to rebuttal evidence that Wharton was an escape artist who, on one occasion, escaped the deputy sheriff's custody in City Hall and had to be shot twice to be recaptured, and who, on two occasions three years later, was found in possession of implements of escape (one in the form of a makeshift handcuff key). Such evidence -- revealing a striking common theme -- would have either prevented or negated one of counsel's main arguments for a life sentence: given his risk of escape, there was no guarantee that Wharton would remain incarcerated for the rest of his life if sentenced to life imprisonment. Undoubtedly, in its own closing argument, the Commonwealth would have argued that by possessing implements of escape (one fashioned into a handcuff key), Wharton repeatedly demonstrated that he was an escape risk and posed a danger to others in prison and thus the only

appropriate sentence to ensure the safety of those in prison and the community at large was death (N.T. 3/8/21, 37).

It is because of this potential scenario that the District Court properly found trial counsel's testimony that the escape evidence was not serious enough to outweigh the positive adjustment evidence "unconvincing." As noted by the District Court, the testimony or argument that Wharton was never leaving jail would have had "little value had the jury heard the escape evidence." *Wharton*, 2022 WL 1488038, at *14.

For all of these reasons, trial counsel did not perform below an objective standard of reasonableness by not presenting Wharton's "positive" prison adjustment evidence.[7]

---

[7] Wharton asserts that counsel acted unreasonably when he failed to investigate Wharton's prison record prior to his resentencing. However, the failure to investigate is meaningless without the existence of helpful evidence. *See Scott v. Diaz*, 2016 WL 8969577, at *11 (C.D. Cal. Dec. 16, 2016), *report and recommendation adopted*, 2017 WL 2177984 (C.D. Cal. May 16, 2017) ("The prejudice caused by a failure to investigate results from trial counsel's inability to introduce helpful evidence that investigation would have uncovered, not from the lack of an investigation itself."). It was not unreasonable for counsel not to investigate Wharton's prison adjustment when counsel had no reason to think he would find helpful evidence. Counsel knew about Wharton's City Hall escape when it occurred (N.T. 3/8/21, 35-36). A reasonable lawyer would find investigation into Wharton's prison adjustment a bad idea.

**B.  The District Court Properly Found That Wharton Failed to Establish a Reasonable Probability That the Outcome of His Penalty Phase Would Have Been Different if Only the Jury Had Heard Evidence of His "Positive" Prison Adjustment.**

The District Court properly found that Wharton cannot make the requisite showing of prejudice to prevail on his ineffectiveness claim. To establish prejudice, Wharton "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011) (quoting *Strickland*, 466 U.S. at 694). A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Jermyn v. Horn,* 266 F.3d 257, 282 (3d Cir. 2001) (quoting *Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999)).

In assessing whether there was prejudice, courts must "consider *all* the relevant evidence that the jury would have had before it if [counsel] had pursued [a] different path." *Williams*, 637 F.3d at 227 (quoting *Wong v. Belmontes*, 558 U.S. 15, 20 (2009)). "In so doing, we cannot merely consider the mitigation evidence that went unmentioned in the first instance; we must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony." *Id.* Once the court has reconstructed the record, it must "reweigh the evidence in aggravation against the totality of available mitigation evidence." *Id*. (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)). Only then can the court determine whether there is a reasonable probability that, but for counsel's

ineffectiveness, the result of the proceeding would have been different. *Williams*, 637 F.3d at 227. Thus, even if counsel's performance was deficient, a petitioner cannot prevail if counsel's error "had no effect on the judgment." *Strickland*, 466 U.S. at 691.

The District Court correctly found that the penalty phase record and aggravating circumstances, coupled with the evidence regarding Wharton's negative prison behavior, establish that Wharton failed to establish a reasonable probability that the jury would have sentenced him to life imprisonment if it had heard about his alleged positive prison adjustment.

### 1.    The Penalty Phase Evidence

Over the course of six days, the jury heard the details of Wharton's repeated terrorization, destruction, vandalization and burglaries of the victims' home and church prior to the murders over a debt that he believed was owed to him (N.T. 12/14/92, 79-110); the jury heard the details of how the victims were separated, bound, masked with duct tape, strangled and/or drowned even after Wharton forced Bradley Hart to write him a check to satisfy the purported debt (N.T. 12/14/92, 36-58, 72-73; N.T. 12/15/92, 98-99; N.T. 12/16/92, 33-44; N.T. 12/18/92, 6-16, 26-30); the jury heard that Wharton left the victims' baby girl alone in the unheated home in subfreezing temperatures after killing her parents (N.T. 12/14/92, 61; N.T. 12/15/92, 33-39; N.T. 12/16/92, 14-28; N.T. 12/18/92, 8, 34); the jury heard the events leading

up to Wharton's arrest, during which police recovered proceeds from the series of burglaries/robberies at the victims' home (N.T. 12/16/92, 83-111; N.T. 12/17/92, 37-38; N.T. 12/18/92, 61-70); and the jury heard Wharton's confession to the brutal murders ("I had put this tape around her face from her eyebrows down to her chin while we was in the bathroom first before I dunked her head in the water. I held her head down in the water till the bubbles stopped after a while"), and his explanation for why he killed them ("cause they knew me and would turn us in") (N.T. 12/17/92, 8-22).

In addition, the jury viewed extensive physical evidence of Wharton's crimes, including the ligatures, bindings, and duct tape that he used to subdue, mask, and strangle the victims (N.T. 12/18/92, 55-59). The jury also viewed numerous photographs depicting the lifeless victims bound, masked, strangled and/or drowned at the crime scene: Ferne Hart on her knees, bent over the bathtub, with her face submerged in water, her hands and feet bound, her face masked with duct tape, a necktie wrapped tightly around her neck, her shirt pulled up exposing her breasts, and her pants down to her ankles; and Bradley Hart lying face down on the ground with his face in a pail of water, his hands and feet bound behind his back, his entire face mummified with duct tape, two electrical cords tightly wrapped around his neck and a sneaker print visible on the back of his shirt. Photographs depicted the victims at the medical examiner's office, the duct tape that had been removed from the

victims' bodies, and the family that existed before Wharton murdered the young couple and orphaned their child (N.T. 12/15/92, 37; N.T. 12/16/92, 3-4).

As stated by the District Court, "the vicious nature of Wharton's offenses and the aggravating circumstances found by the jury cannot be understated. The brutality exhibited by Wharton and his co-defendant as they terrorized Bradley and Ferne Hart for months before murdering them and leaving their infant daughter to freeze to death would surely have weighed heavily in the minds of the jury." *Wharton*, 2022 WL 1488038, at *13.

In light of the particularly heinous nature of Wharton's crime spree and murders, coupled with the aggravating circumstances (killing while perpetrating a robbery/burglary and the fact that Wharton committed two murders), the jury would not likely have reached a different result on the basis of: brief, boilerplate comments in some monthly PRC reports noting that Wharton had periods where his adjustment was "routine," "positive," "satisfactory," "problem-free," or "uneventful" and was "cordial" and "polite" (which Jeffrey Beard explained was the "minimum" expectation for an inmate in the RHU population, N.T. 5/11/21, 56); evidence that he pursued the GED; maintained family ties; had good housing reports; filed grievances; did not act out further in DC; and did not physically assault or spit on anyone in the RHU.

The District Court properly found that Wharton's escape conviction and surrounding facts "would greatly undermine any positive prison adjustment evidence" and "[i]t is difficult to fathom how any juror would have found Wharton's positive adjustment evidence more significant than this premeditated escape from a City Hall courtroom followed by two subsequent misconducts, received days apart, for possessing a makeshift handcuff key and other implements of escape. This particular evidence would be most significant in the minds of the sentencing jury, especially when viewed in conjunction with the facts of Wharton's murder of Bradley and Ferne Hart." *Wharton*, 2022 WL 1488038, at *14.

Wharton has failed to show that he was prejudiced by trial counsel's failure to present his so-called "positive" prison adjustment records. *See Williams*, 637 F.3d at 236-37 (given the nature of the brutal crimes and aggravating circumstances, and the equivocal nature of the mitigation evidence, Williams could not meet "his burden of demonstrating there was a reasonable probability [that] the presentation of [mitigating] evidence would have resulted in a life sentence instead of the death penalty"); *Dorsey v. Vandergriff*, 30 F.4th 752, 759 (8th Cir. 2022), *cert. denied*, 2023 WL 2123837 (U.S. Feb. 21, 2023) (finding no "reasonable probability that evidence of Dorsey's adjustment to incarceration would have tipped the balance in favor of mitigation in the jury's view . . . especially given that the State did not rely on evidence of jail misconduct as an aggravator, and the evidence of Dorsey's

adjustment to incarceration was not unequivocally positive anyway"; "any weight that the jury might have placed on Dorsey's adjustment to incarceration "pales in comparison" to the horrific nature of Dorsey's conduct—raping his cousin, murdering her and her husband after they took him into their home to protect him, leaving their four-year-old daughter an orphan, and stealing their property to satisfy his drug debt"); *Bryan v. Bobby*, 843 F.3d 1099, 1115-16 (6th Cir. 2016) (the defendant failed to establish a reasonable probability that the result of the penalty phase would have been different if counsel had presented his "mixed prison record" where he had killed one person and repeatedly tried to kill another, all while trying to escape arrest for another committed offense); *Trice v. Ward*, 196 F.3d 1151, 1162-63 (10th Cir. 1999) (the defendant failed to demonstrate that the outcome of the sentencing phase would have been different had counsel presented his positive prison records where the underlying facts of the defendant's crimes were horrific and the defendant confessed to the crimes); *see also Bucklew v. Luebbers*, 436 F.3d 1010, 1021 (8th Cir. 2006) (stating that "no prejudice resulted" in capital case from defense counsel's failure to pursue a line of argument that would have had a "mixed impact").[8]

---

[8] Wharton's claim that the District Court applied a "subjective" standard when assessing the prejudice prong is without merit. The District Court's reference to the factors it considered demonstrates that there were abundant bases for its finding, not that it impermissibly applied a subjective standard. During its prejudice inquiry, the

## 2.     The Irrelevant Jury Deliberations

Wharton claims that the District Court disregarded the jury's purported struggle to reach a verdict when assessing the prejudice prong of the ineffectiveness test. The parties' attempt to interject the jury's deliberations in this case into the prejudice analysis should be rejected.

As an initial matter, it is necessary to set forth the time period during which the jury deliberated. The jury started deliberating at 4:07 p.m. on December 21, 1992 and recessed for the day at 4:50 p.m. (deliberating for about 45 minutes). The jury resumed deliberations on December 22, 1992 at 11:00 a.m. At 4:34 p.m. (after 5½ hours), the jury indicated that it was unable to reach a unanimous verdict (N.T. 12/21/92, 134-38; N.T. 12/22/92, 8, 12-13). The trial court told the jury that it had not deliberated "nearly long enough" and dismissed the jury for the day. In denying trial counsel's "very much premature" motion for a mistrial, the trial court noted that "the deliberation period of approximately eight hours after several weeks of trial, is certainly not unduly long" (N.T. 12/22/92, 15). On December 23, 1992, at 3:00 p.m., the jury reached a verdict (N.T. 12/23/92, 2). As properly recognized by the District Court, "the jury heard overwhelming evidence of aggravating facts. A three-day

---

(continued . . . )

District Court's reference to the evidence it considered simply indicates that there was ample evidence to support the finding. That is an objective application of the prejudice prong.

deliberation over whether to impose a death sentence provides little insight into what form the jury's deliberations took before the jury was ultimately convinced of its conclusion." *Wharton*, 2022 WL 1488038, at *13 n.11.

The parties surmise that because the jury supposedly had difficulty reaching a sentencing verdict *without* the "positive" adjustment evidence, then it maybe could have returned a verdict of life imprisonment if only it had known about Wharton's "positive" adjustment evidence. But more than mere conceivability is required to establish prejudice: "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. at 112.

Moreover, in making this assertion, the parties completely disregard the fact that the jury would have also heard all of the *anti-mitigation evidence* -- the evidence of his violent premeditated escape attempt and subsequent misconducts for possession of implements of escape. If anything, this escape evidence was additional *aggravating* evidence of far more weight that would have further motivated the jury to reach its verdict of death.

The DAO further tries to bolster its claim by commenting on a question posed by the jury during its deliberations. The DAO asserts that the jury:

> expressed interest in the type of information that counsel failed to present – evidence regarding defendant's behavior *after* the victims' murders.  In assessing the weight of defendant's character evidence, the jury specifically asked whether it could consider defendant's behavior after the crime, or simply his character as it existed at the time of the

> crime. The court told the jury it could consider defendant's character both before and *after* the crime.

(DAO Brief, 8-9, 28) (emphasis added). This point by the DAO actually *undermines* their position. If anything, it underscores that the jury would have been interested in hearing that, *after* defendant brutally murdered the victims and left their infant alone in the unheated family home to die: (1) he apologized for his crimes in another case and then minutes later came alarmingly close to escaping City Hall with the use of a handcuff key and had to be shot twice by sheriffs to be apprehended; and (2) just three years after that, on two separate occasions just days apart, he continued his propensity of trying to escape custody by fashioning implements of escape (one involving a makeshift handcuff key) out of antennas.

The District Court properly found that the jury's deliberation process in this case was not relevant to its prejudice assessment.

### 3.    Attempt to Extend the Relevant Time Period

The parties attempt to expand the claim to include Wharton's prison adjustment *after* his 1992 penalty hearing, even though that evidence did not exist then. Any evidence pertaining to Wharton's prison adjustment *after* December of 1992 is irrelevant to the claim, as none of that evidence would have been available for trial counsel to present at the 1992 penalty phase hearing. That Wharton may have improved his prison behavior during the years after his 1992 penalty phase has no relevance on whether he had positive adjustment during the time between his two

penalty phase hearings. Counsel was not ineffective for not presenting evidence that did not yet exist. That behavior should not be considered in any way.

## IV. WHARTON HAD A FULL AND FAIR OPPORTUNITY TO LITIGATE HIS PRISON ADJUSTMENT CLAIM BEFORE THE DISTRICT COURT.

Now that the escape evidence has been revealed and the District Court found that it defeated his claim of positive prison adjustment on the merits, Wharton claims that he was denied fair and impartial proceedings before the District Court. According to Wharton, the District Court created an appearance of unfairness and partiality when it: (1) permitted the *amicus curiae* to participate in the proceedings; (2) rejected the parties' Link "stipulation" at the conclusion of the hearing; (3) permitted the victims' family to be heard at the hearing; and (4) exhibited "frustration" with the DAO's concession. Wharton has failed to show how any of these rulings (each of which was proper under the circumstances), or "frustration" by the District Court (which was also appropriate under the circumstances), had any impact on its ability to be fair and impartial when deciding *his* ineffectiveness claim.

Wharton's disagreement with the District Court's rulings and his attribution of supposed "frustration" to the court are not valid grounds for claiming the District Court was unfair. *See Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion [under § 455(a)]" since they rarely "evidence the degree of favoritism or antagonism

required ... when no extrajudicial source is involved"); *Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 330 (3d Cir. 2015) (adverse rulings are not in themselves proof of prejudice or bias); *Thompson v. Comm'r of Soc. Sec.*, 425 F. App'x 98, 101 (3d Cir. 2011) ("We agree with the District Court that Thompson's allegations amounted to mere disagreement with the court's adverse rulings, which does not form a sufficient basis for recusal . . . and find[] nothing in the record to suggest that the judge had developed "a deep-seated favoritism or antagonism" toward Thompson that would "make fair judgment impossible"); *Securacomm Consulting, Inc. v. Securacom, Inc*., 224 F.3d 273, 278 (3d Cir. 2000) ("[A] party's displeasure with legal rulings does not form an adequate basis for recusal."); *In re TMI Litig*., 193 F.3d 613, 728-29 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) ("Petitioners' allegations amount to little more that disagreement with her legal rulings. Disqualification is not an appropriate remedy for disagreement over a legal ruling. In the event the court's evidentiary rulings may be in error, they are subject to review on appeal.").

The purpose of federal law regarding disqualification of a judge when his "impartiality might reasonably be questioned" is "to promote public confidence in the integrity of the judicial process." *Liljeberg v. Health Servs. Acquisition Corp*., 486 U.S. 847, 860 (1988). But here the District Court's rulings *promoted* public confidence in the integrity of these proceedings. Those rulings resulted in

43

appropriate judicial review of the merits and avoided setting aside a state criminal judgment based on an incomplete rendition of the facts and unlawful grounds. *Wharton v. Vaughn*, Memorandum Opinion, Sept. 12, 2022, p.16 (ECF 314) ("had this Court simply accepted the concession, and the public and victims later learned of the escape, the Court's statement that it had 'carefully' reviewed the matter could rightfully be called into question, as would the public's trust in the legal process").

## A.    Extent of Amicus Participation

Despite the District Court's numerous attempts to ascertain the factual and legal basis for why death sentences imposed by a jury thirty years earlier for horrific crimes should be set aside, it did not get one from the parties. Given the highly unique sequence of events in this case, the District Court properly exercised its discretion to ask the OAG, as *amicus curiae*, to weigh in and participate in the manner it did. Without the OAG's amicus participation, none of the powerful anti-mitigation prison adjustment evidence -- evidence that was critical to the issue remanded by this Court -- would have been revealed to the District Court.

The extent to which an amicus curiae participates in a pending action is solely within the broad discretion of the district court. *See Hard Drive Prods., Inc. v. Does 1-1,495*, 892 F. Supp. 2d 334, 337 (D.D.C. 2012) (because the amicus' participation is for the benefit of the court, it is solely within the Court's discretion to determine "the fact, extent, and manner" of participation); *see also Newark Branch, N.A.A.C.P.*

*v. Town of Harrison, N.J.*, 940 F.2d 792, 808 (3d Cir. 1991) (an *amicus curiae* serves "for the benefit of the court, assisting the court in cases of general public interest by making suggestions to the court, by providing supplementary assistance to existing counsel, and by insuring a complete and plenary presentation of difficult issues so that the court may reach a proper decision") (quoting *Alexander v. Hall*, 64 F.R.D. 152, 155 (D.S.C.1974)).  That participation may include involvement in evidentiary proceedings, and many courts have so directed.[9]

---

[9] *See e.g.*, *United States v. CVS Health Corp.*, 2019 WL 2085718, at *1 (D.D.C. May 13, 2019) (finding that it would be helpful for the *amici curiae* participating in the matter to present witnesses at a hearing; "This hearing is merely an opportunity for the parties and the *amici* to provide the Court with whatever information and analysis they believe will aid the Court in determining whether the Government's proposed final judgment is in the public interest."); *Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 272 F. App'x 817, 818 (11th Cir. 2008) (recognizing that court permitted *amici curiae* to participate in injunction hearing); *Massachusetts v. Microsoft Corp.,* 373 F.3d 1199, 1206 (D.C. Cir. 2004) (noting that district court allowed *amicus curiae* to participate in hearing); *Black Hills Inst. of Geological Research v. U.S. Dep't. of Justice*, 978 F.2d 1043, 1044 (8th Cir. 1992) (noting that *amicus curiae* presented multiple expert witnesses at hearing in district court); *Hoptowit v. Ray,* 682 F.2d 1237, 1260 (9th Cir. 1982) ("We conclude that the district judge did not abuse his discretion in appointing the Department of Justice and the United States Attorney as *amicus curiae*. Although we recognize that participation of the United States in this case was somewhat more than the usual participation of amici [in that the amicus participated fully in the discovery, trial, and appeal of this case], we are unable to say that the degree of amicus's participation was error or in any way prejudiced the rights of the State."), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995)); *United States v. American Telephone and Telegraph Co*., 1976 WL 1321, at *2 (D.D.C. 1976) (district court "invites and urges" *amicus* to attend and participate in the hearing); *United States v. Hooker Chemicals & Plastics Corp*., 101 F.R.D. 451, 459 (W.D.N.Y. 1984) ("the court strongly encourages each of the applicants to participate as *amici curiae* in the

The District Court properly exercised its discretion in directing the OAG to take part in the proceedings. The District Court requested that participation in order to have the benefit of a developed factual record that could assist it in carrying out its duty to determine the merits of the legal claim that this Court directed it to resolve. *See Liberty Res., Inc. v. Philadelphia Housing Auth*., 395 F. Supp. 2d 206, 209 (E.D. Pa. 2005) (participation of an amicus is especially proper where the amicus will ensure "complete and plenary presentation of difficult issues so that the court may reach a proper decision").

Wharton's assertion that the District Court acted "unfairly" in directing the amicus to participate is merely a mask for his true objection, which is that his claim was subjected to an *actual adversarial hearing* that revealed that he was not entitled to relief. The amicus was asked to participate regarding a single, discrete issue. The District Court was permitted to consider the amicus' view, along with the different view shared by the parties.

---

(continued . . . )

hearings that will be held in connection with the court's review of the proposed settlement and judgment"), *aff'd*, 749 F.2d 968 (2d Cir. 1984); *see also Russell v. Bd. of Plumbing Examiners of Cty. of Westchester*, 74 F. Supp. 2d 349, 351 (S.D.N.Y. 1999) ("A court can allow *amici* to call their own witnesses and cross examine the witnesses of other parties"), *aff'd*, 1 F. App'x 38 (2d Cir. 2001).

This Court directed that the District Court consider anti-mitigation evidence at the remanded hearing and that was only going to come from the amicus. As aptly recognized by the District Court, "were it not for the assistance of the Attorney General, there was a risk that this Court may have ordered habeas relief that, under the law, it had no power to grant . . ." and "had this Court simply accepted the concession, and the public and victims later learned of the escape, the Court's statement that it had 'carefully reviewed' the matter could rightfully be called into question, as would the public's trust in the legal process." *Wharton v. Vaughn*, Memorandum Opinion, Sept. 12, 2022, p.16 (ECF No. 314).

## B.    Rejection of Link "Stipulation"

The District Court did not abuse its discretion in declining to accept the parties' proposed "stipulation" to the 6-page declaration of defense corrections expert Cynthia Link, who did not testify at the evidentiary hearing. *See United States v. Brown*, No. 21-5716, 2022 WL 3211096, at *2 (6th Cir. Aug. 9, 2022) (reviewing district court's evidentiary rulings for abuse of discretion).[10]

A stipulation is a "voluntary agreement between *opposing parties* concerning some relevant point." *Budiyono v. Atty. Gen. of U.S.*, 181 F. App'x 332, 335 (3d Cir.

---

[10] Even though the District Court rejected the Link "stipulation," Wharton still improperly refers to the opinions and conclusions contained in her declaration as if they had been subject to cross-examination and credited by the District Court. The contents of Link's declaration should not be considered by this Court.

2006), as amended (Feb. 22, 2007) (unpublished) (citing Blacks's Law Dictionary 1427 (7th ed.1999) (emphasis added). Generally, a stipulation is not problematic because it has been entered into by parties on *opposite sides* of the litigation when the parties are willing to agree on a specific fact relevant to the litigation.  But those were not the circumstances in this case.

The parties engaged in a concerted effort to secure penalty phase relief to Wharton (notwithstanding the compelling escape evidence), and they both actively litigated against the OAG, as *amicus curiae*, at the hearing. The parties were on *the same side* and their proposed "stipulation" proffered after all of the evidentiary hearing testimony had been presented was not a "stipulation" at all. It was a backdoor attempt to introduce another defense expert witness's testimony (6 pages worth) without having that witness subject to what would have been extensive cross-examination by the *amicus curiae*.

But for the OAG's involvement in the hearing as an amicus, there would have been no adversarial testing of a constitutional claim. The District Court never would have heard the details about Wharton's escape evidence and how it adversely impacted his prison adjustment. And the District Court never would have learned of the significant weaknesses in the testimony of the defense witnesses that were elicited during the OAG's cross-examination (such as the fact that Dr. Blumberg completely discounted Wharton's City Hall escape from his assessment and the fact

48

that Maureen Baird conceded that more weight should be placed on factors involving an inmate's escape risk and whether he has engaged in any conduct that poses a threat to those in the institution itself).

Given the highly unique circumstances in this case, the District Court did not abuse its discretion in rejecting the proposed "stipulation." Nor did it reflect an appearance of impropriety for doing so.

### C.    Testimony of Victims' Family at the Hearing

Wharton's assertion that allowing the victims' family members to be heard at the evidentiary hearing created an appearance of impropriety is equally without merit.

First, under the Crime Victims' Rights Act, 18 U.S.C. § 3771(b)(2)(A), the District Court was obligated to ensure that the victims in this homicide case were provided an opportunity to be "reasonably heard at any public proceeding" involving sentencing or release and are "treated with fairness and with respect for [their] dignity and privacy." 18 U.S.C. § 3771(a)(3)-(4), (8), (b)(1). These rights apply to Section 2254 habeas proceedings. *Id.* at § 3771(b)(2). Prosecutors are obligated to honor these rights by notifying and consulting with victims of crime. *See* 18 U.S.C. § 3771(a), (b)(2); 18 P.S. §§ 11.201, 11.213(b), (e), (f). The victims' family members had an independent right to be heard.

Second, the District Court indicated that the victims' family's testimony had

no bearing on the merits of Wharton's Sixth Amendment claim. *Wharton*, 2022 WL 1488038, at *4 n.3. It is presumed that the District Court, sitting as fact-finder at the evidentiary hearing, can separate the evidence regarding the merits of the ineffectiveness claim and the testimony of the victims' family under the Crime Victims' Rights Act.

Third, the DAO made communication with the victims' family a direct issue when in its Notice of Concession it provided that its decision was based on "communication with the victims' family." Lisa Hart-Newman, the surviving infant who Wharton left to freeze to death after murdering her parents, and other siblings of the victims, however, advised the District Court through letters submitted by the *amicus curiae* that they were <u>never</u> notified about the concession and vigorously opposed it.[11] Thus, there was a direct and significant factual dispute on this issue that the District Court was entitled to explore.

### D.    "Frustration" with the DAO Concession

When the DAO repeatedly tried to concede penalty phase relief without providing a sufficient legal and factual basis for doing so, the District Court took painstaking efforts to conduct a proper and complete independent evaluation of the facts and law before ruling on the claim remanded by this Court. What Wharton calls

---

[11] In his letter to the District Court, Dr. Tony Hart, the brother of victim Bradley Hart, revealed that while he was contacted by the District Attorney's Office (the only one), he was misadvised about the status of the case.

"frustration" and a possible sign of "impropriety" and "unfairness" by the District Court, was actually the District Court fulfilling its judicial obligations under the law.

In *Sibron v. New York*, 392 U.S. 40 (1968), the United States Supreme Court reasoned that "[i]t is the uniform practice of this Court to conduct its own examination of the record in all cases where the Federal Government or a State confesses that a conviction has been erroneously obtained." *Id.* at 58. *See Young v. United States*, 315 U.S. 257, 258-59 (1942) ("[O]ur judicial obligations compel us to examine independently the errors confessed.").

The Pennsylvania Supreme Court made a similar pronouncement that supports this conclusion just five months before the DAO tried to concede the claim in this capital case. *See Commonwealth v. Brown*, 196 A.3d 130, 141-49 (Pa. 2018) ("[I]f the 'power' of a court amounts to nothing more than the power 'to do exactly what the parties tell it to do, simply because they said so and without any actual merits review, it is not judicial power at all. It is a restriction on power.'").

Whatever concerns the District Court had with the DAO's conduct, propriety and ethics in this case (which is currently the subject of another appeal before this Court),[12] they in no way impeded Wharton's ability to fully and fairly litigate his

---

[12] And to the extent the District Court expressed any frustration, the Supreme Court has found that such remarks do not reflect bias or partiality.

ineffectiveness claim. While represented by two experienced capital habeas counsel, Wharton presented testimony from his former trial counsel, a mental health expert and a corrections expert. He introduced hundreds of prison records. His counsel vigorously cross-examined the numerous fact witnesses and expert witnesses presented by the OAG, and made various objections and arguments to the District Court throughout the hearing. Additionally, Wharton litigated pre-hearing motions *in limine* and objections, filed numerous pleadings during the course of the hearing, and filed a post-hearing brief after the hearing. That the District Court had legitimate concerns about the DAO's conduct did not somehow make the Court unfair and biased against Wharton, or interfere with his ability to litigate his ineffectiveness claim. The District Court gave Wharton every opportunity to present his evidence and, as evidenced by its Opinion, it carefully considered his claims.

---

(continued . . . )

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. […] *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.

*Liteky v. United States*, 510 U.S. 540, 555-56 (1994) (italics in original).

The District Court should be affirmed.


                              Respectfully submitted,


                              MICHELLE A. HENRY
                              Attorney General
                              Commonwealth of Pennsylvania


                        By: */s/ Cari L. Mahler*
                              Cari L. Mahler
                              Senior Deputy Attorney General
                              Criminal Law Division
                              Appeals Section


Date:  April 7, 2023

# **CERTIFICATIONS OF COMPLIANCE**

Pursuant to Rule 29(a)(4)(G) and Rule 32(g)(1) of the Federal Rules of Appellate Procedure, the undersigned hereby certifies that this amicus brief contains 12,729 words, in accordance with this Court's Order of March 2, 2023.

I further certify that I am a member of the bar of the United States Court of Appeals for the Third Circuit; that the text of the electronic brief is identical to the text in the paper copies; that McAfee VirusScan Enterprise version 8.8.0.16 has been run on this file and no virus was detected; and that this brief complies with the typeface requirements and type-style requirements of the Federal Rules of Appellate Procedure in that this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in fourteen-point Times New Roman font.


By:  _____
     Cari L. Mahler
     Senior Deputy Attorney General


Date:  April 7, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date I served a copy of the foregoing on the following persons in the manner indicated below:

BY ELECTRONIC SERVICE THROUGH ECF

STUART LEV
ELIZABETH MCHUGH
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
601 Walnut Street, Suite 545
Philadelphia, PA 19106

PAUL M. GEORGE
Assistant Supervisor, Law Division
NANCY WINKELMAN
Supervisor, Law Division
Office of the Philadelphia District Attorney
3 South Penn Square
Philadelphia, PA 19107


Cari L. Mahler
Senior Deputy Attorney General


Date:  April 7, 2023