# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

No. 22-9001

_____

ROBERT WHARTON,
Appellant,

v.

SUPERINTENDENT GRATERFORD SCI, et al.,
Appellees.

_____

On Appeal from Order of United States District Court,
Eastern District of Pennsylvania (Goldberg, J.) entered
May 11, 2022, in Civil Action No. 2-01-cv-06049

**PETITION FOR REHEARING EN BANC**

STUART LEV
ELIZABETH MCHUGH
Federal Community Defender Office
 Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA  19106
(215) 928-0520
Stuart_lev@fd.org

*Counsel for Appellant, Robert Wharton*

Dated:  June 27, 2024

## STATEMENT OF COUNSEL UNDER
## FED. R. CIV. P. 35(B)(1) AND L.A.R. 35.1

We express our belief, based upon reasoned and studied professional judgment, that the panel's opinion and judgment denying relief is contrary to decisions of the United States Court of Appeals for the Third Circuit and the Supreme Court of the United States, that consideration by the full court is necessary to secure and maintain uniformity of decisions in this Court, and that this appeal involves questions of exceptional importance:

1.    That the Pennsylvania Office of the Attorney General was properly allowed, as amicus, to fully assume the role of party-opponent in place of the duly elected representative of the citizens of Philadelphia, the District Attorney, presents a question of exceptional importance, and was contrary to state law limiting the powers of the Attorney General as determined by the Pennsylvania Legislature;

2.    The panel's failure to properly apply the one juror standard of prejudice, where the mitigation evidence that counsel failed to present was both favorable and unfavorable to the defense, was contrary to the United States Supreme Court opinions in *Williams v. Taylor*, 529 U.S. 362 (2000) and *Porter v. McCollum*, 558 U.S. 30 (2009), as well as this Court's opinion in *Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006), and presents a question of exceptional importance;

i

3.      The panel's erroneous understanding that Pennsylvania law required a juror to find that mitigating circumstances outweighed aggravating circumstances in order to vote for a life sentence imposed an improperly heightened burden of proving prejudice that was contrary to the United States Supreme Court opinions in *Williams v. Taylor*, 529 U.S. 362 (2000) and *Strickland v. Washington,* 466 U.S. 668 (1984), as well as this Court's opinion in *Saranchak v. Sec'y, Pa. Dep't of Corr.,* 802 F.3d 579 (3d Cir. 2015), and presents a question of exceptional importance.

# TABLE OF CONTENTS

STATEMENT OF COUNSEL UNDER FED. R. CIV. P. 35(B)(1) AND L.A.R. 35.1 ................................................................................................ i

TABLE OF AUTHORITIES ..................................................................... iv

STATEMENT OF THE CASE.....................................................................1

    A.   Procedural History .........................................................................1

    B.   Summary of Relevant Facts ...........................................................3

REASONS FOR GRANTING REHEARING .........................................8

I.    THE PANEL'S APPROVAL OF THE DISTRICT COURT'S DECISION TO ALLOW THE OFFICE OF THE ATTORNEY GENERAL, ACTING AS AMICUS, TO WREST CONTROL OF THE PROCEEDINGS FROM THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE, WHO, AS THE ELECTED REPRESENTATIVE OF THE PEOPLE OF PHILADELPHIA WAS COUNSEL FOR THE RESPONDENTS, CREATES A CONFLICT WITH PENNSYLVANIA LAW AND WITH OTHER COURTS ABOUT THE PROPER ROLE OF AN AMICUS THAT SHOULD BE REVIEWED EN BANC. ...........................................8

    A.   Factual Background .......................................................................9

    B.   Conflict with Pennsylvania Law...................................................10

    C.   Conflict with Other Courts ..........................................................12

II.   THE PANEL'S APPLICATION OF THE ONE JUROR STANDARD OF PREJUDICE WHEN WEIGHING BOTH POSITIVE AND NEGATIVE EVIDENCE CONFLICTS WITH DECSIONS OF THE SUPREME COURT AND THIS CIRCUIT........................................15

III.  THE PANEL ERRONEOUSLY IMPOSED A HEIGHTENED STANDARD OF PREJUDICE WHEN IT MISAPPLIED PENNSYLVANIA CAPITAL SENTENCING LAW. ..................................28

CONCLUSION.........................................................................................31

iii

# TABLE OF AUTHORITIES

## Federal Cases

*Abdul-Salaam v. Secretary, Pennsylvania Department of Corrections*,
805 F.3d 254 (3d Cir. 2018) ................................................................. 25

*Andrus v. Texas*, 140 S. Ct. 1875 (2020) ........................................... 15, 17

*Bridges v. Beard*, 941 F. Supp. 2d 584 (E.D. Pa. 2013) ....................... 23

*Johnson v. Superintendent Fayette SCI*, 949 F.3d 791 (3rd Cir. 2020) .......... 23, 24

*Liberty Res., Inc. v. Philadelphia Hous. Auth.*, 395 F. Supp. 2d 206
(E.D. Pa. 2005) .................................................................................. 13, 14

*Marshall v. Hendricks*, 307 F.3d 36 (3d Cir. 2002) ............................... 29

*Massey v. Superintendent, SCI Coal Township*, 2021 WL 2910930 at *6
(3d Cir. July 12, 2021) ........................................................................ 18

*Neonatologist Associates P.A. v. Commissioner of Internal Revenue*,
293 F.3d 128 (3d Cir. 2002) ................................................................. 12

*Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006) ........................... ii, 21, 22

*Porter v. McCollum*, 558 U.S. 30 (2009) ............................. ii, 19-20, 25

*Rompilla v. Beard*, 545 U.S. 374 (2005) ............................................. 25

*Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579
(3d Cir. 2015) ......................................................................... iii, 25, 28-29

*Sciotto v. Marple Newtown School District*, 70 F. Supp. 2d 553
(E.D. Pa. 1999) .................................................................................... 12

*Skipper v. South Carolina*, 576 U.S. 1 (1986) ....................................... 2

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................... iii

*Thornell v. Jones*, 144 S. Ct. 1302 (2024) ...................................... 20, 21

*United States v. Michigan*, 940 F.2d 143 (6th Cir. 1991) ................ 12, 13

*Waste Mgmt. of Pa. Inc., v. York*, 162 F.R.D. 34 (M.D. Pa. 1995) ......... 12-13

*Wharton v. Vaughn*, 722 F. App'x. 268 (3d Cir. 2018) ..................... 1, 15

*Williams v. Stirling*, 914 F.3d 302–19 (4th Cir. 2019) ......................... 23

*Williams v. Taylor*, 529 U.S. 362 (2000) ............................. ii, iii, 19, 21

## State Cases

*Commonwealth v. Ballard*, 80 A.3d 380 (Pa. 2013) .............................. 28

*Commonwealth v. Carsia*, 517 A.2d 956 (Pa. 1986) ............................................. 11

*Commonwealth v. Mulholland*, 702 A.2d 1027 (Pa. 1997) ............................ 10-11

*Commonwealth v. Saranchak*, 866 A.2d 292 (Pa. 2002) ........................................ 28

*Commonwealth v. Wharton*, 607 A.2d 710 (Pa. 1992) ........................................... 1

# STATEMENT OF THE CASE

### A.   Procedural History

In February 1984, Mr. Wharton and his co-defendant, Eric Mason, were arrested for the murders of Bradley and Ferne Hart.  William Cannon was appointed to represent Mr. Wharton.  Wharton and Mason were tried together, and the jury found both defendants guilty of two counts of first-degree murder, robbery, and related offenses.  The jury sentenced Mr. Wharton to death but spared Mason's life.  Mr. Wharton was formally sentenced to death in September of 1986.

In 1992, the Pennsylvania Supreme Court reversed Wharton's death sentence and remanded for a new penalty hearing.  *Commonwealth v. Wharton*, 607 A.2d 710 (Pa. 1992).  At that hearing, after over thirteen hours of deliberation spanning three days, including a reported deadlock after seven hours, the jury rejected two of the aggravating circumstances sought by the prosecution (torture and grave risk of danger to the surviving baby), but found that two other aggravating circumstances (multiple murders and commission during a felony) outweighed the mitigating circumstances and returned a verdict of death.  *See Wharton v. Vaughn*, 722 F. App'x. 268, 270 (3d Cir. 2018); A316-19; A332-33; A339.

After exhausting his state court remedies, Mr. Wharton sought habeas corpus relief.  Following an evidentiary hearing on two guilt-innocence claims, the

district court denied relief on all claims, including Mr. Wharton's claim that his counsel was ineffective for failing to present evidence of his positive adjustment in prison during the years between his initial death sentence and his resentencing ("*Skipper* claim").[1]  This Court granted COA on his *Skipper* claim, affirmed the denial of relief on his guilt-innocence phase claims but remanded the *Skipper* claim for an evidentiary hearing.  722 F. App'x. at 285.

On remand, the Philadelphia District Attorney's Office ("DAO") concluded that the ineffectiveness/*Skipper* claim was meritorious, and the parties submitted a proposed order to the district court.  The district court ordered the parties to submit additional briefing explaining the reasons for the DAO concession.  A62.  Both the DAO and counsel for Mr. Wharton submitted additional briefing addressing the court's concerns.  Unsatisfied with the briefs submitted by the parties, the district court refused to accept the agreement and appointed the Office of the Attorney General ("OAG") to submit an amicus brief on whether relief should be granted and whether an evidentiary hearing was necessary.  A65-68.  The OAG submitted a brief asserting that the *Skipper* claim lacked merit and interjecting allegations that the DAO had not properly informed the victim's family about its concession of error.  The DAO and Mr. Wharton filed briefs in response, again addressing the

---

[1] *Skipper v. South Carolina*, 576 U.S. 1 (1986).

facts underlying the *Skipper* claim and the reasons supporting the proposed agreement.

The court again rejected the concession and ordered an evidentiary hearing, allowed the OAG to fully participate in the hearing as amicus curiae (including the ability to present evidence and call and cross-examine witnesses), and expanded the scope of the evidentiary hearing to include evidence of "the District Attorney's communication with the victims' family in connection with its concession of penalty phase relief." A72-81. Mr. Wharton filed a motion in limine that asked the court to reconsider those rulings that was eventually denied. A83-91.

After an evidentiary hearing, in which the OAG acted as both the party-opponent and counsel for the victims, the district court denied relief and granted COA. A3. Mr. Wharton appealed. On March 8, 2024, a panel of this Court (Hardiman, Bibas, Phipps, JJ.) issued a precedential opinion, authored by Judge Hardiman, affirming the district court's denial of relief. A copy of that opinion is attached. After this Court issued several orders extending the time for filing, Mr. Wharton now files this timely petition for rehearing en banc.

### B.    Summary of Relevant Facts

Although Mr. Wharton had been in state custody for six years, trial counsel did not order Mr. Wharton's incarceration records or investigate his prison adjustment. A534. He explained that his failure to investigate this area of

3

mitigation was not based on any strategy: "It was just pure ignorance." *Id*. He stated that his "failure to present, investigate [prison] records, present those records, present the expert testimony, [was] simply a failure on my part to be knowledgeable about the *Skipper* case . . . ." A571.

Had he investigated, counsel would have learned that following his 1985 death sentence, Mr. Wharton, who was only twenty-one years old at the time of his crimes, was transferred to the state prison system in 1986. Because of his death sentence, he was placed in the restricted housing unit (RHU), where he was generally confined to his cell for twenty-two hours a day, was not allowed to participate in educational or vocational programs, and had limited visitation and telephone contact. A1581-1653. For the next three years, Mr. Wharton regularly obtained positive reports for his behavior and had only three minor misconducts. *Id*. There were no incidents of assaultive, violent, or threatening behavior. *Id*.

In May of 1989, on two occasions, a few days apart, a search of his cell uncovered pieces of a broken antenna. A1555-72. One piece had been bent into the shape of a handcuff key, though no one ever tested it to see if it could actually unlock a handcuff. A972-73; A1011. Mr. Wharton received two misconducts for possession of contraband, a serious violation of prison rules.[2] A1555-72.

---

[2] The panel appeared to treat this as an escape attempt Op. at 13 (referencing repeated escape attempts). But Mr. Wharton was never disciplined for or charged with attempting to escape. There was no evidence that the makeshift key could

4

Although he denied knowledge of these objects, a prison hearing examiner found him guilty and he was given 90 days of disciplinary time for each infraction, where most of the few privileges he was allowed as a death row prisoner were taken from him. *Id*.

Mr. Wharton served his disciplinary time without further incident and was released early on good behavior. A1616. Although his television and radio privileges were denied for a few more months, Mr. Wharton did not act out; rather, he pursued the appropriate grievance channels to eventually get those privileges restored. A1619-20. Even after those privileges were restored, Mr. Wharton continued on his path of good behavior. For the next three years, up until the time of his resentencing trial, Mr. Wharton had only one minor misconduct for doing martial arts exercises when he was alone in a locked cage used for RHU prisoners to exercise. A1643. No disciplinary action was taken.

Thus, Mr. Wharton's disciplinary record shows that, except for the two misconducts in May 1989, he behaved well. He got along with correction officers and prison authority. He followed the rules. He sought out appropriate persons when he had a problem, or used the prison grievance system to address issues as they arose. He had no assaultive, threatening, or violent conduct. Most

---

have unlocked any handcuffs and no evidence that he ever tried to use the broken antenna pieces in any way.

5

importantly, for the three years prior to his resentencing, he caused no problems, except for the one minor misconduct.

The district court did not dispute any of the above.  Instead, the court focused on events that occurred before Mr. Wharton entered the state prison system.  A8.  In 1986, Mr. Wharton, then in county custody, was brought to City Hall for sentencing on an unrelated offense.  After the sentencing, as he was being escorted back to the cell room, Mr. Wharton pushed a deputy sheriff and attempted to flee, running down the stairs.  His escape attempt ended when he was shot in the stairwell by a sheriff's deputy.  *Id*.  Other than Mr. Wharton, no one was injured in the incident.  Mr. Wharton eventually pled guilty to escape in December of 1986 and all other charges (simple assault, possession of implements of escape) were nolle prossed.  A1534-43.[3]

In addition to the evidence from the records, Mr. Wharton and the OAG both presented expert witnesses who reviewed the records.  Mr. Wharton's experts concluded that the records showed a generally positive adjustment that was likely to continue in the future.  Although Dr. Beard, the OAG corrections expert, agreed

---

[3] Charges relating to the possession of a handcuff key were dropped, there was no evidence presented at the evidentiary hearing that a handcuff key was used, and there was no property receipt confirming the seizure of a handcuff key.  Nor was there any evidence that Mr. Wharton admitted to using a handcuff key at the time of his guilty plea to escape.  Nevertheless, the panel wrote that a handcuff key was used and linked that use to the prison misconduct.  Op. at 7.  Such belief is just not supported by the record.

that the records showed examples of positive behavior, they concluded that Mr. Wharton's overall development was negative in light of the City Hall escape and his two major misconducts.  Dr. beard agreed, however, that the Pennsylvania DOC had maximum-security facilities that could safely house Mr. Wharton. A1115, 1168-71.

In finding that Mr. Wharton had not shown that his lawyer's failure to present evidence of his positive prison adjustment was prejudicial, the panel, like the district court, relied on this escape attempt and the 1989 misconducts to negate Mr. Wharton's generally good conduct once he entered the state system and his three years of excellent conduct following his 1989 disciplinary sanctions.  A15. Both the panel and the district court held that this evidence was so overwhelming that there was no possibility that even a single juror would have used his prison conduct, coupled with the other mitigation that counsel had presented, as a reason to vote for a life sentence.  A16.

Even without the evidence of Mr. Wharton's good prison conduct, the resentencing jurors struggled with their verdict.  They deliberated for more than thirteen hours over the course of three days.  A316-19, A332-33, A339.  They asked a question about finding mitigation that arose after the crime, found there were some mitigating circumstances, and rejected two of the four aggravating

circumstances that had been submitted to them. A1662-65. Still, the panel

concluded that the probative value of the deadlock was "minimal." Op. at 15.

The deadlock note shows that there were one or more jurors who were

willing to vote for life, despite the presence of aggravating circumstances. Had

those jurors been informed of Mr. Wharton's prison conduct, there is a reasonable

probability that at least one juror, who was already disposed to vote for life, would

have done so.

## REASONS FOR GRANTING REHEARING

**I.     THE PANEL'S APPROVAL OF THE DISTRICT COURT'S
        DECISION TO ALLOW THE OFFICE OF THE ATTORNEY
        GENERAL, ACTING AS AMICUS, TO WREST CONTROL OF THE
        PROCEEDINGS FROM THE PHILADELPHIA DISTRICT
        ATTORNEY'S OFFICE, WHO, AS THE ELECTED
        REPRESENTATIVE OF THE PEOPLE OF PHILADELPHIA WAS
        COUNSEL FOR THE RESPONDENTS, CREATES A CONFLICT
        WITH PENNSYLVANIA LAW AND WITH OTHER COURTS
        ABOUT THE PROPER ROLE OF AN AMICUS THAT SHOULD BE
        REVIEWED EN BANC.**

Over repeated defense objection, the district court granted its appointed

amicus, the OAG, an extraordinary level of participation in the hearing. Not only

was the OAG given the full rights of an opposing party, it was allowed to act as the

attorney for the victims – presenting their direct testimony and cross-examining the

DAO victim coordinator. The OAG was allowed to take control of the

proceedings in ways that went far beyond the traditional role of amicus.

The panel gave its full approval to the district court's decision.  Op. at 18.
The panel believed that it was appropriate to allow amicus to "account for the
Commonwealth's interests," Op. at 18, rather than the locally elected District
Attorney who was designated by the legislature to account for those interests.  *Id.*
This extraordinary ruling should be reviewed en banc.

### A.    Factual Background

The OAG, going far beyond the traditional role of amicus, hired experts,
developed evidence, and argued that Appellant was not entitled to relief.  The
OAG also interjected issues relating to the DAO's communications with members
of the victim's family that were irrelevant to the constitutional question remanded
by this Court.  The district court determined that an evidentiary hearing was
appropriate, on both the remanded issue and the DAO communications.  Over
Appellant's objections, the court allowed the OAG to participate in the evidentiary
hearing as if it were a party.

The OAG conducted hours of vigorous cross-examination of Appellant's
witnesses, and presented testimony from expert witnesses it had hired to rebut
Appellant's evidence.  The OAG also presented hundreds of pages of exhibits.
Indeed, the OAG even successfully objected to a stipulation agreed to by the
named parties, concerning the testimony of an expert who, due to health reasons,

was unable to appear at the hearing, on the grounds that it was not afforded the right of cross-examination.  Tr. 8/5/21 at 128-130.

In addition, the OAG presented members of the victim's family to describe their communications, or lack thereof, with the DAO, and their frustration and disagreement with the DAO position that constitutional error had occurred.  The OAG filed an extensive post-hearing brief arguing that relief should be denied.

In this Court, again over Appellant's objection, the OAG was allowed to act as a de facto party-opponent that briefed and argued in support of the district court's decision.

### B.  Conflict with Pennsylvania Law

Ceding control of the proceedings to the OAG conflicts with the way in which Pennsylvania has structured the relationship between the OAG and the elected district attorneys of individual counties.  This issue presents important questions of law, federalism, and the extent to which a federal court can re-arrange the priorities set forth by a state legislature.

Pennsylvania limits the power of the Attorney General.  Under Pennsylvania law, the District Attorney has statutory responsibility for all prosecutions that arise in the county that elected him or her.  *See* 16 Pa. Cons. Stat. § 4402.  The Attorney General may assume responsibility for those prosecutions only in specifically enumerated situations.  *See Commonwealth v. Mulholland*, 702 A.2d 1027, 1036-

10

38 (Pa. 1997).  The Commonwealth Attorneys Act "made it clear that the powers of the state Attorney General are no longer an emanation from some bed of common law precepts, but are now strictly a matter of legislative designation and enumeration." *Commonwealth v. Carsia*, 517 A.2d 956, 956-58 (Pa. 1986).  Under the Commonwealth Attorneys Act, 71 Pa. Cons. Stat. § 732-205(c), the Attorney General may prosecute a case that otherwise belongs to the province of the district attorney only under the circumstances described in §§ 205(a)(3), (4), or (5) – none of which are applicable here.

Pennsylvania thus made a deliberate choice to vest power and control of criminal prosecutions, including habeas corpus litigation, in the hands of the elected district attorney.  That policy allows the district attorney to represent the interests of the voters who put them in office.  The power is local, reflecting the interests of the community where the crime took place, rather than state-wide to reflect the interests of the Commonwealth as a whole.

The district court turned these interests upside down.  By allowing the OAG to act as a party and take control of the litigation, the district court, and the panel opinion approving of those actions, allowed the OAG to define the interests of the community, rather than the voters who elected the district attorney of Philadelphia.  Such actions allow a federal court to undo the delicate balance set by the Pennsylvania legislature anytime it questions the position taken by a state

prosecutor. This sets a dangerous precedent. En banc review of such intrusive actions is appropriate.

## C.    Conflict with Other Courts

Whether amicus may participate in proceedings "was, and continues to be, a privilege within 'the sound discretion of the courts.'" *United States v. Michigan*, 940 F.2d 143, 164 (6th Cir. 1991) (citing *Northern. Sec. Co. v. United States*, 191 U.S. 555 (1903), and AMERICAN JURISPRUDENCE § 4, at 113 (2d. ed. 1962)). Amicus curiae has historically been used to describe an impartial individual who suggests the interpretation and status of the law and whose function is to advise in order that justice may be done, rather than to advocate a point of view so that a cause may be won by one party or another. *Sciotto v. Marple Newtown School District*, 70 F. Supp. 2d 553, 554 (E.D. Pa. 1999) (citations and quotations omitted). Amici are not parties to the case, but rather assist the court by submitting briefing designed to supplement and assist in cases of general public interest, supplement the efforts of counsel, and draw the court's attention to law that might otherwise escape consideration. *Id.*

This Court generally allows for the consideration of amicus briefs that are "relevant" and "desirable." *Neonatologist Associates P.A. v. Commissioner of Internal Revenue*, 293 F.3d 128, 129 (3d Cir. 2002) (Alito, J.). Nevertheless, there are limits. "[A]micus should not assume control of the litigation." *Waste Mgmt. of*

*Pa. Inc.*, *v. York*, 162 F.R.D. 34, 36 (M.D. Pa. 1995) (quoting *Wyatt by & through Rawlins v. Hanan*, 868 F. Supp. 1356, 1358 (M.D. Ala. 1994)).

In *United States v. Michigan*, 940 F.2d 143 (6th Cir. 1991), the Sixth Circuit rejected the notion of "litigating amicus curiae" that are essentially "an extrajudicial, de facto named party/real party in interest." *Id.* at 166. The Sixth Circuit recognized that the traditional role of amicus was "not to provide a highly partisan account of the facts, but rather to aid the court in resolving doubtful issues of law." *Id.* at 165. While some courts have allowed a modest departure from this traditional role, allowing limited adversary support in an amicus brief, amicus "has never been recognized, elevated to, or accorded the full litigating status of a named party or a real party in interest." *Id.* Thus, "amicus has been consistently precluded from initiating legal proceedings, filing pleadings, or otherwise participating and assuming control of the controversy in a totally adversarial fashion." *Id.* (citations omitted). *See Liberty Res., Inc. v. Philadelphia Hous. Auth.*, 395 F. Supp. 2d 206, 208-10 (E.D. Pa. 2005) (allowing amicus to participate but ordering that amicus "shall perform none of the functions reserved to parties, such as calling or cross-examining witnesses, taking depositions, or requesting the production of documents"). That is exactly what happened below. The DAO is the lawful representative of Respondents, and the OAG has no authority to participate in this case and challenge the decisions of the DAO outside its request

to be amicus.  Yet in the court below, the OAG used its amicus appointment to seize control of the proceedings and advocate against the positions adopted by the DAO, in favor of the positions taken by former prosecutors – some of whom appeared on the OAG filings.  Whatever name the district court applied to the OAG role, the reality of that role was to become a party-opponent, advocating a position in contrast to the one taken by the actual party-opponent, and interjecting issues irrelevant to the constitutional question remanded by this Court.  Acting as "litigating amicus curiae," the OAG's actions were designed to divert the court and undermine the credibility of the DAO.  As the Sixth Circuit warned, "[t]o condone the fiction of 'litigating amicus curiae,' in reality an extrajudicial, de facto named party/real party in interest, would extend carte blanche discretion to a trial judge to convert the trial court into a free-wheeling forum of competing special interest groups capable of frustrating and undermining the ability of the named parties/real parties in interest to expeditiously resolve their own dispute." *Id.* at 166.

This Court has not previously considered whether there should be limits on a court's ability to allow amicus to take control over a case.  The panel's decision stands in direct conflict with *Michigan.*  En banc review of this important question is appropriate.

## II.   THE PANEL'S APPLICATION OF THE ONE JUROR STANDARD OF PREJUDICE WHEN WEIGHING BOTH POSITIVE AND NEGATIVE EVIDENCE CONFLICTS WITH DECSIONS OF THE SUPREME COURT AND THIS CIRCUIT.

In a state like Pennsylvania, where a death sentence can only be imposed by a unanimous jury, prejudice results from counsel's deficient performance when there is a reasonable probability that *one juror* would have reached a different result and voted for a life sentence but for counsel's error. *See Wharton v. Vaughn*, 722 F. App'x. 268, 281–82 (3d Cir. 2018) (citing *Blystone v. Horn*, 664 F.3d 397, 426–27 (3d Cir. 2011)). *See also Andrus v. Texas*, 140 S. Ct. 1875, 1886 (2020) (prejudice only requires a reasonable probability that a single juror would weigh all the evidence and strike a different balance) (citing *Wiggins v. Smith*, 539 U.S. 510, 536 (2003)).

This case asks this Court to examine and apply that one juror standard in a situation where counsel's deficient performance led to the omission of evidence that was both favorable and unfavorable to the defendant.  Trial counsel failed to investigate and present evidence of Mr. Wharton's positive adjustment to prison following his transfer to state custody.  Counsel conceded that his error was not the product of a strategic decision, but was based on his ignorance of the law.  A534, 571.  As a result of counsel's errors, the jury never learned that in the three years prior to resentencing, Mr. Wharton displayed exemplary conduct.  The jury also never learned of the many positive reports about his conduct, the absence of any

15

reports of violence or threatening behavior, and the expert testimony that, if

sentenced to life, he could be safely housed by the DOC.

Mr. Wharton presented facts and circumstances that weighed in favor of

finding prejudice:

- For the three years prior to the trial, Mr. Wharton had a near perfect record of behavior except for one minor misconduct for which he received a warning;

- Mr. Wharton had no instances of violent or assaultive behavior during his six and a half years in state custody;

- Trial counsel testified that he failed to investigate Mr. Wharton's prison adjustment because he was not aware that such evidence could be used at the resentencing trial;

- Trial counsel testified that he believed the prison records showed that Mr. Wharton had adjusted well in prison;

- Trial counsel testified that he would have presented such evidence to the jury even if it would have allowed the Commonwealth to present evidence of the escape and misconducts;

- Trial counsel testified that the adjustment evidence would have been consistent with his penalty phase strategy;

- After more than a full day of deliberation, the jury submitted a note that it was deadlocked; and

- After another six hours of deliberation, the jury rejected two aggravating circumstances alleged by the Commonwealth (torture and grave risk to another) and found three mitigating factors, but ultimately sentenced Mr. Wharton to death.

Records from the Program Review Committee were overwhelmingly

positive. A1656-57. The district court found that "[t]he PRC noted in various

reviews that Wharton was polite, cordial, well-mannered, well-behaved, and had regular contacts with his counselor. Wharton did not exhibit any signs of assaultive, predatory, or violent behavior while incarcerated at SCI Huntington the relevant time period. According to Wharton's corrections expert, the PRC repeatedly noted that Wharton was adjusting well." A10. In addition, the four yearly Prescriptive Program Plans showed that Mr. Wharton "maintain[s] misconduct free behavior," "sustain[s] positive housing reports," "exercise[s] routinely," "maintain[s] counselor contacts," and "continue[s] with educational development." *Id.* (citations omitted). Mr. Wharton maintained contact with family and friends. He received regular visits. He attended chapel services. Most importantly, "Wharton received no negative housing reports or negative psychiatric reports." A11.

Such evidence would have shown Mr. Wharton's peaceful, non-violent behavior and overall ability to comply with prison rules and directives. Defense counsel testified that he could have used the records to argue that Mr. Wharton was accepting of his situation and "rather than hang his head, he pursues things that around him to be a semi-vibrant member of the prison community by seeking educational opportunities, doing writings, doing drawings and participating to the extent that he can in prison life in a meaningful way." A544.

There were, however, unfavorable aspects to Mr. Wharton's prison record, including the City Hall escape and four minor and two serious misconducts. The escape occurred as Mr. Wharton was being escorted through public and unsecured areas of City Hall. These circumstances are far different than incarceration in a maximum security prison, behind a myriad of locked and secured gates, barriers and fences, that would be in place if sentenced to life. Counsel acknowledged that the misconducts reflected negatively on Mr. Wharton but explained that they would not have deterred him from presenting positive prison adjustment because the confiscated items "were not used by him in some creative way that would imperil prison security" and, overall, "these records were very favorable." A553.

The bottom line is this. Some jurors might have been persuaded by the negatives, but others could reasonably find the positive behaviors to be more compelling. *See Massey v. Superintendent, SCI Coal Township*, 19-2808, 2021 WL 2910930 at *6 (3d Cir. July 12, 2021) (unpublished) ("The fact that one or more jurors may have made those findings does not *per se* negate the possibility that at least one juror could have found otherwise"). The same is true regarding the experts. Some jurors could reasonably find that Mr. Wharton's experts were more persuasive; others might be persuaded by the amicus experts.

In this case, the panel discounted Mr. Wharton's positive achievements and ignored the reasonable probability that any one juror could have favorably weighed

Mr. Wharton's overall positive adjustment and lack of violent or assaultive

conduct, and in combination with all other mitigation that counsel presented, voted

for a life sentence.  Op. at 12-13.  There is little support for such speculation.

Indeed, a single juror could reasonably vote for life based solely on the belief that

Mr. Wharton's behavior over the most recent three-year period showed that he is

capable of rehabilitation.  Instead, the panel simply presumed that every juror

would weigh the negative behavior more heavily than the positive.  This Court

should review the appropriateness of that presumption and address the proper

manner in which to weigh positive and negative behavior under the one juror test

of prejudice.

The panel's analysis conflicts with opinions from the United States Supreme

Court.  The Supreme Court has recognized that although mitigation evidence may

have negative aspects, that does not negate its overall value or render counsel's

error harmless.  In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court

found that the defendant had been prejudiced even though "not all of the additional

evidence was favorable."  *Id.* at 396.  here.  Moreover, the Supreme Court has held

that a court may not discount mitigation evidence because of its perceived

aggravating aspects.  *See*, *e.g.*, *Porter*, 558 U.S. at 42 (unreasonable to discount

import of mitigating evidence about the defendant's military record because it had

aggravating components, including that the defendant had gone AWOL more than once). The panel here committed that same error.

The Supreme Court's recent decision in *Thornell v. Jones*, 144 S. Ct. 1302 (2024), does not change this analysis. Although the Supreme Court had the opportunity to reshape the test for penalty phase prejudice, it did not do so, but instead relied on the well-established standards set forth in *Strickland*. *Id.* at 1307.

*Thornell* in fact underscores the critical nature of the evidence Mr. Wharton's counsel failed to present. *Thornell* recognizes prejudice is not shown where "[m]ost of the [postconviction] mitigating evidence . . . was not new." *Id.* at 1311. Jones presented "extensive evidence" of cognitive impairment and "much on [the] topic" of abuse at trial, and in post-conviction proceedings he sought "a second look at essentially the same evidence." *Id.* at 1312. Here, the evidence concerning Mr. Wharton's prison adjustment is far different from any of the evidence presented at trial. While counsel did present witnesses who testified about their relationships with Mr. Wharton while incarcerated, and their view of his character, there was no evidence of his positive prison reports, educational accomplishments, disciplinary history, and non-violent behavior. Because the evidence at issue here is materially different from the evidence presented at trial, *Thornell* suggests that a showing of prejudice is attainable.

In addition, *Thornell* did not apply the one juror test of prejudice. Under Arizona law, Jones was sentenced to death by the court. Thus, the justices were not called upon to decide if the new evidence could have affected the vote of a single juror, even if all of the other jurors would weigh it differently. For this reason as well, *Thornell* has very limited applicability here.

Finally, the Supreme Court held that the Ninth Circuit erred in granting habeas relief because it "downplayed the serious aggravating factors present here and overstated the strength of mitigating evidence that differed very little from the evidence presented at sentencing." *Id.* at 1314. The panel here employed the opposite, but equally erroneous, approach. It downplayed the significance of the mitigating evidence and overestimated the strength of the aggravating evidence. Since any one juror could reasonably reach a different balance, the panel erred in finding that Mr. Wharton has not shown prejudice.

The panel's decision also conflicts with this Court's opinion in *Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006). In *Outten*, this Court held that counsel's failure to adequately investigate the defendant's background was prejudicial even though "not all of the evidence in the records counsel failed to investigate is favorable." *Id.* at 422. This Court recognized, "[t]his is nearly always the case," *id.,* just as the Supreme Court had acknowledged in *Williams*, 529 U.S. at 398. Even under AEDPA's high standard, this Court found prejudice because counsel

21

could have argued a broader range of mitigation and "persuading even one juror to vote for life imprisonment could have made all the difference." *Outten,* 464 F.3d at 422.

The panel also unfairly diminished the probative value of the jury deliberations where one or more jurors were willing to vote for life even without the evidence of his good prison conduct. Many judges would have ended the deliberations where, as here, the jurors indicated that they were deadlocked after seven hours of deliberation.[4] Even after the judge ordered them to return the next day to continue their deliberations, the jurors took most of the next before they ultimately reached

---

[4] Rafiq Thompson was found guilty of murdering his ex-girlfriend and unborn child, the jury deliberated six hours in penalty phase and was declared hung, and Thompson sentenced to two life sentences. https://www.inquirer.com/crime/rafiq-thompson-philadelphia-murder-life-sentence-20230920.html
Shaun Warrick was found guilty of murdering his ex-girlfriend and her cousin. The jury hung after just three hours of deliberation in penalty phase despite minimal mitigation evidence.
https://www.inquirer.com/philly/news/20150821_Jurors_weigh_death_penalty_in_Valentine_s_Day_killings.html
Omar Cash carjacked and kidnapped a man and his girlfriend, shot and killed the man, and repeatedly raped the girlfriend. A life sentence was imposed when the jury deadlocked after four hours of deliberation.
https://www.inquirer.com/philly/news/local/20100603_Cash_gets_life_in_prison_for_Bucks_killing.html#loaded
Gerald Drummond and Robert McDowell were convicted of double homicide including the murder of a 15 year old. The jury hung after four hours of deliberations, a life sentence imposed for both defendants.
https://www.inquirer.com/philly/news/local/20110114

22

the decision to impose a death sentence. Particularly for those jurors already

inclined to vote for life, there is a reasonable probability that positive prison

adjustment evidence could have led a single juror to maintain their belief a life

sentence was appropriate. *See Bridges v. Beard*, 941 F. Supp. 2d 584, 619-20

(E.D. Pa. 2013) (finding prejudice from counsel's failure to introduce mitigation

evidence in death penalty case "particularly" because the jury was deadlocked).

*See also Williams v. Stirling*, 914 F.3d 302, 318–19 (4th Cir. 2019) (finding

counsel's failure to present evidence of Fetal Alcohol Syndrome prejudicial where

jury deliberated for two days and was deadlocked at one point).

     Unlike the panel, the jury did not view this as an overwhelming case in favor

of death. In addition to the deadlock and the length of deliberations, the jury

rejected two of the four aggravating circumstances that the prosecution had asked

them to find. Indeed, a separate jury, hearing the same evidence about the nature

of the crime, had sentenced Mr. Wharton's co-defendant to life.

     This Court has agreed with other federal circuits that when determining

whether a trial error was prejudicial or harmless, "the length of jury deliberations

may be one consideration in assessing the strength to the prosecution's case."

*Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 805 (3rd Cir. 2020)

(collecting cases from five different federal circuits). A finding that error is not

harmless is especially likely when there are other factors in the record that

altogether create "a strong indication [the] case was a close call for the jury." *Id.* In this case, the length of jury deliberations, its deadlock note, its questions for the court, and its rejection of two aggravating circumstances demonstrate that this was a close case.

Yet the panel found that the probative value of the jury's deadlock note was "minimal" because the jury "worked through its disagreements so quickly" that it was not much of a deadlock. Op. at 15. The panel's conclusion that six hours of additional deliberation was so quick as to undermine the jury's struggles is disingenuous. Six hours is a substantial amount of deliberation reflective of a real dispute among the jurors. Moreover, nothing in the record suggests a single "hold-out" juror or a mild or shallow dispute. And the panel ignored the fact that the jury rejected two of the most serious aggravating circumstances, including the allegation that the perpetrators had tortured the victims and created a grave risk to the baby. In short, the panel dismissed the jury's struggles simply because those struggles did not fit with its no-prejudice analysis. En banc review is appropriate.

Nor did the facts of this case compel a death sentence. The first jury to hear this case sentenced Mr. Wharton's equally responsible co-defendant to life. The resentencing jury likewise did not find the aggravating facts overwhelming, as reflected by their deadlock note, the rejection of the aggravating circumstances of torture and grave risk to infant Lisa Hart, and the finding that the fact that the

infant was not killed was a mitigating circumstance.  A1662.  In short, the heinous

nature of the crime did not preclude a reasonable juror from accepting the positive

aspects of Mr. Wharton's behavior, and voting for life knowing that even the

Commonwealth's experts would agree that he could be safely housed in

Pennsylvania prisons.

The Supreme Court has found prejudice even in highly aggravated cases.

*See, e.g.*, *Porter*, 558 U.S. at 32-33 (double murder committed during burglary);

*Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (torturous murder during robbery of

bar; petitioner had history of violent felony convictions, including prior conviction

for rape and assault).  This Court has similarly found prejudice from trial counsel's

failure to adequately investigate and present mitigation even in highly aggravated

cases.  *E.g. Abdul-Salaam v. Secretary, Pennsylvania Department of Corrections*,

805 F.3d 254 (3d Cir. 2018) (jury found four aggravating circumstances where

defendant, after committing an armed robbery, assassinated a police officer who

was attempting to arrest his co-defendant); *Saranchak v. Secretary, Pennsylvania*

*Department of Corrections,* 802 F.3d 579 (3d Cir. 2015) (defendant shot and killed

his grandmother and uncle while burglarizing the house and robbing the uncle).

Research confirms that the thorough investigation and presentation of

mitigating evidence can make a difference even in highly aggravated cases. *See*

Russell Stetler et. al., *Mitigation Works: Empirical Evidence of Highly Aggravated*

*Cases Where the Death Penalty Was Rejected at Sentencing*, 51 Hofstra L. Rev. 89 (2022) (documenting over 600 highly aggravated cases, again including some from Pennsylvania, where juries nonetheless chose life).

The panel generally discounted the expert testimony, finding that there were reasons to discount their testimonies and concluding that they generally balanced out. Op. at 14-115. But again, this analysis distorts the one juror standard. Even if the experts were equally impeachable, that simply means that jurors can disagree about the weight to be given their testimony. Any one juror could have concluded that Petitioner's experts were more credible. And any one juror could have relied on the amicus expert's admissions that there were positive aspects to Mr. Wharton's record and that the Pennsylvania DOC could safely house Mr. Wharton in a maximum-security prison to discount any suggestion of future dangerousness and vote for a life sentence. For example, Dr. Beard, the amicus corrections expert, agreed with the defense expert that the DOC was well equipped to house inmates like Mr. Wharton for a life sentence. A1115, 1168–71. Dr. Beard also agreed that Mr. Wharton's time in disciplinary custody was difficult, and his good behavior under those conditions was a positive factor in his adjustment. A1190. He acknowledged that Mr. Wharton's attendance at religious services, educational pursuits, good housing reports, contact with family, and lack of violence were all evidence of positive adjustment to incarceration. A1162, 1167, 1200, 1213, 1221.

Dr. O'Brien, the amicus mental health expert, also agreed that Mr. Wharton displayed positive traits while in custody. He agreed that Mr. Wharton's efforts to further his education represented a constructive use of his time. A778. He acknowledged that the PRC reports documented that Mr. Wharton was polite, cooperative, and interactive with staff, and that his PPP reports showed that Mr. Wharton met his yearly institutional goals of maintaining positive contacts with his counselor, pursuing his education, and engaging in physical exercise. A786–87; A828.

Considering all of the evidence in this case, including that presented at trial and at the hearing, both favorable and unfavorable, a prosecutor's concession that Appellant had shown prejudice was consistent with the facts and faithful to the *Wiggins* one juror standard. The United States Supreme Court has held that a prosecutor's concession is entitled to "great weight," though it does not relieve the court of its duty to make an independent judicial determination. When made with full disclosure of the facts and a detailed explanation of the supporting reasons, as was done in Appellee's Brief in this Court, it helps to tip the scales in Mr. Wharton's favor.

Any single juror could have relied on the positive aspects of the amicus expert testimony and voted for life knowing that that Mr. Wharton could be safely held and become a productive and cooperative inmate. Indeed, such a finding

27

would have accurately predicted what has happened. Mr. Wharton's spotless record of good behavior since the 1992 resentencing demonstrates that he had made a positive adjustment and that the amicus expert predictions that he was a future risk were wrong. *See* Appellee Brief at 2–4, 15, 21, 26, 31 n.7. This Court should grant en banc review.

### III. THE PANEL ERRONEOUSLY IMPOSED A HEIGHTENED STANDARD OF PREJUDICE WHEN IT MISAPPLIED PENNSYLVANIA CAPITAL SENTENCING LAW.

Under Pennsylvania capital sentencing law, a juror must vote for death if "the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." 42 Pa.C.S.A. §9711(c). *See Commonwealth v. Ballard*, 80 A.3d 380, 409 (Pa. 2013). "The verdict must be a sentence of life imprisonment in all other cases." *Id.,* § 9711(c)(1)(iv).

Pennsylvania law does not require a juror to find that the mitigation outweighs the aggravating circumstances to vote for a life sentence. Instead, it requires a juror to vote for a life sentence if that juror believes that the aggravating and mitigating circumstances are equally balanced. "Penalty-phase prejudice occurs whenever there is a reasonable probability that even a single juror would have concluded that the mitigating circumstance existed and that, together with any other mitigation, it outweighed (or was of equal weight with) the aggravating circumstances." *Commonwealth v. Saranchak*, 866 A.2d 292, 310 n.2 (Pa. 2002)

(Saylor, J., concurring and dissenting).  *See Saranchak*, 802 F.3d at 597

(recognizing that petitioner would have been sentenced to life imprisonment – not

death – "if even one juror had found that the aggravating circumstances did not

outweigh any mitigating circumstances").

In *Marshall v. Hendricks*, 307 F.3d 36, 103-04 (3d Cir. 2002), citing New

Jersey's then existent death penalty statute, N.J. Stat. Ann. § 2C:11-3c(3), this

Court observed that "even if the aggravating and mitigating factors were of equal

weight, under New Jersey's sentencing scheme, the sentence would be life in

prison, not death."  Before its abolition, New Jersey's death penalty statute

mandated a weighing process similar to the one set forth in 42 Pa.C.S.

§9711(c)(1)(iv).  In considering New Jersey's statutory weighing scheme, this

Court observed that *Strickland's* prejudice prong:

> has a somewhat more subtle application in the penalty phase than in the
> guilt phase. . . . Given the unanimity requirement, the "reasonable
> probability of a different outcome" would mean that only one juror need
> weigh the factors differently and find that the aggravating factor did not
> outweigh the two mitigating factors; *even if the aggravating and
> mitigating factors were of equal weight*, under New Jersey's sentencing
> scheme, the sentence would be life in prison, not death.

*Marshall*, 307 F.3d at 103-04 (emphasis added).  Thus, *Marshall* recognized that in

a jurisdiction with a statutory weighing scheme like New Jersey's (and

Pennsylvania's), the fact that a petitioner would receive a sentence of life in prison,

29

and not death, where the weight of the aggravating and mitigating factors are equally balanced, is an essential feature of the prejudice analysis.

The panel got it wrong. Here, the panel looked at whether the *mitigation could have outweighed the aggravating circumstances*: "In a capital case, the court must decide whether the new evidence 'would have convinced [even] one juror to find that the mitigating factors outweighed the aggravating factors." Op at 12. Thus, this erroneous prejudice standard is contrary to Pennsylvania law and in conflict with this Court's opinion in *Marshall*.

The application of an erroneous standard of review skewed the panel's analysis of the issues. Rehearing is necessary so that the Court can correct its mistake and apply the proper standard. Because the panel has expressed its views about the weight to be given to the aggravating and mitigating evidence, and has already determined that Appellant failed to prove prejudice, albeit under a wrong standard, the case should be heard by the Court en banc.

## CONCLUSION

For the reasons above, this Court should grant rehearing en banc to review the

important issues in this case and correct the panel's errors.

Respectfully submitted,

/s/ Stuart Lev
STUART LEV
ELIZABETH MCHUGH
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA  19106
(215) 928-0520
Stuart_Lev@fd.org

*Counsel for Appellant*

Dated:  June 27, 2024

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), that the attached petition of Appellant Robert Wharton:

1.      Contains 7,032 words.  Appellant will file a motion to expand the word limits with this Petition.

2.      Complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2010, in 14-point Times New Roman font;

3.      Has been scanned for viruses using Symantec Endpoint Protection and is free from viruses; and

4.      That the text of the electronic petition is identical to the text in the paper copies.

/s/ Stuart Lev
Stuart Lev

Dated:  June 27, 2024

## CERTIFICATE OF BAR MEMBERSHIP

I certify, pursuant to Third Circuit Local Rule 28.3(d), that I am a member of the Bar of this Court.

/s/ Stuart Lev
Stuart Lev

Dated: June 27, 2024

# CERTIFICATE OF SERVICE

I, Stuart Lev, hereby certify that on this date I served a copy of the foregoing on

the following person in the manner indicated below:


BY ELECTRONIC SERVICE THROUGH ECF

Paul George, Esq.
Office of the Philadelphia District Attorney
3 South Penn Square
Philadelphia, PA 19107

Cari Mahler, Esq.
Office of Attorney General
Criminal Law Division
Appeals and Legal Services Section
16th Floor, Strawberry Square
Harrisburg, PA 17120



/s/ Stuart Lev
Stuart Lev


Dated: June 27, 2024